IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAROLE MALLORY,

                    Plaintiff,

        v.                                              CIVIL ACTION
                                                        NO. 14-5702
S & S PUBLISHERS, et al.,

                    Defendants.

## OPINION

**Slomsky, J.**                                                **March 9, 2016**

## I.    INTRODUCTION

        This case involves allegations of defamation arising from a 2013 biography entitled
Norman Mailer: A Double Life.  From 1983 to 1992, Plaintiff Carole Mallory was romantically
involved with the late American writer Norman Mailer.  In 2013, six years after Mailer's death,
Defendant Simon and Schuster, Inc. published Norman Mailer: A Double Life, written by
Defendant J. Michael Lennon.  The biography "captures Mailer in all his sharp complexities and
shows us how he self-consciously invented and reinvented himself throughout his lifetime."  J.
Michael Lennon, Norman Mailer: A Double Life, inside cover (2013).  Though the biography
discusses Mallory and Mailer's relationship, Mallory was never contacted to review the book
before publication.  She now brings this suit for defamation, alleging that the biography
mischaracterized her relationship with Mailer as being "strictly sexual" when in fact the two
were in a "long-time, loving relationship."  (Doc. No. 61 ¶ 10.)  Defendants have filed a joint
Motion to Dismiss, which is now ripe for a decision.  (Doc. No. 65.)

## II.    BACKGROUND

Plaintiff Carole Mallory has worked as a supermodel, writer, and journalist.  (Doc. No. 61 ¶ 10.)  She currently resides in Pennsylvania.  (Id. ¶ 3.)  In the 1970s and 1980s, she appeared in films including The Stepford Wives.  (Transcript of Motion to Dismiss hearing ("Tr.") at 20:24.)  During the 1980s and 1990s, Mallory had an eight-year affair with Norman Mailer.  (Tr. at 18:16.)  Mallory is the author of a 2009 memoir entitled Loving Mailer, which chronicles the affair.[1]  (Tr. at 6:1.)  Mallory and Mailer's relationship is at the heart of the instant lawsuit.

Norman Mailer: A Double Life (the "Biography") was written by Defendant J. Michael Lennon and published by Defendant Simon & Schuster, Inc. in 2013.  (Doc. No. 61 ¶ 8.)  According to the inside cover of the book:

---

[1] "On a motion to dismiss, courts consider the complaint, its exhibits, matters of public record, and documents that form the basis of a claim."  Boeynaems v. LA Fitness Int'l, LLC, No. CIV. A. 10-2326, 2011 WL 4048512, at *1 (E.D. Pa. Sept. 12, 2011) (citing Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004)).   Mallory did not attach any exhibits to the Fourth Amended Complaint ("FAC").  Defendants have attached to the Motion to Dismiss copies of Norman Mailer: A Double Life and Loving Mailer.  Mallory argues that it is improper for the Court to consider at this point in the litigation Norman Mailer: A Double Life and Loving Mailer without converting the Motion to Dismiss into a motion for summary judgment.  (Doc. No. 70 at 8.)

Documents form the basis of a claim, however, if they are "integral to or explicitly relied on" in a complaint.  Stratechuk v. Bd. of Educ., 200 F. App'x 91, 94 (3d Cir. 2006).  Norman Mailer: A Double Life is indisputably integral to and explicitly relied upon in the FAC.  The FAC includes various quotes from Norman Mailer: A Double Life, and the book is central to all of Mallory's claims.  See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A), 768 F.3d 284, 291 (3d Cir. 2014) ("Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim.").  In moving to dismiss the FAC, Defendants rely heavily on Mallory's own memoir, Loving Mailer.  However, Mallory's memoir is not integral to or explicitly relied upon in the FAC.  Therefore, the Court cannot properly consider the memoir at this stage.  Defendants' reliance on Mallory's memoir to challenge her claims is more appropriate at the summary judgment stage.  Accordingly, the Court will consider only Norman Mailer: A Double Life in deciding the Motion to Dismiss.

2

Michael Lennon knew Mailer for thirty-five years, and in writing this biography, he has had the cooperation of Mailer's late widow, Norris Church,[2] his ex-wives, and all of his children, as well as his sister, Barbara.  He also had access to Mailer's vast, unpublished correspondence and papers, and he interviewed dozens of people who knew Mailer.  *Norman Mailer: A Double Life* gives us the man in full, a remarkable and unique figure in the context of his times.

J. Michael Lennon, Norman Mailer: A Double Life (2013).

Mallory contests her portrayal in the Biography.  She alleges that the Biography "repeatedly describes or suggests false perceptions of Plaintiff and her relationship with Norman Mailor [sic], which was incorrectly portrayed as strictly sex in exchange for publicity, money and opportunity."  (Doc. No. 61 ¶ 10.)  She further claims that Defendant Lennon never attempted to contact her to confirm facts regarding her relationship with Mailer.  (Id. ¶ 12.)  According to Mallory, if Defendant Lennon had made an effort to interview her, she would have informed him that various statements made in the Biography are false.  (Id. ¶ 13.)  Specifically, Mallory objects to Defendant Lennon's portrayal of her as a "venal harlot" who seduced celebrities to advance her career and who was only interested in Mailer for his wealth and professional assistance.  (Id. ¶ 13.)  In her Fourth Amended Complaint ("FAC"), which is the operative complaint in this case, she alleges claims of defamation, defamation *per se*, false light, and "commercial disparagement-injurious falsehood," and provides excerpts from the Biography to support these claims.  (Doc. No. 61.)

Mallory notes that the Biography has been published to third parties and is available for purchase both in stores and online.  (Id. ¶ 14.)  She claims that, as a result of Defendants' "malicious publication," her reputation has been diminished and she has suffered severe emotional distress and financial loss.  (Id. ¶¶ 15-16.)

---

[2] Norris Church was married to Mailer from 1980 to 2007.  Lennon, supra, at 525.

On October 6, 2014, Mallory instituted this action pro se against Defendants Simon and Schuster, Inc. ("S & S Publishers"), Ivan Fisher (Mailer's lawyer), author J. Michael Lennon, the estate of Norman Mailer, the estate of Norris Church, and Jack Scovil (Mailer's literary agent).[3] (Doc. No. 1.)  As a pro se litigant, she filed an Amended Complaint on October 9, 2014 (Doc. No. 3), and a Second Amended Complaint and then a Third Amended Complaint on November 3 and 5, 2014, respectively (Doc. Nos. 12, 7).

Defendants filed a Motion to Dismiss on January 16, 2015.  (Doc. No. 37.)  On May 11, 2015, the Court held a hearing on the Motion.  (Doc. No. 57.)  Mallory had obtained counsel prior to the hearing, and her lawyer was present at the hearing.  On June 17, 2015, Mallory filed a counseled FAC.  (Doc. No. 61.)  In Count I of the FAC, Mallory sets forth four separate theories of defamation: (1) defamation; (2) defamation *per se*; (3) false light; and (4) commercial disparagement-injurious falsehood.[4]  (Id. at 6.)

On July 9, 2015, Defendants filed a Motion to Dismiss the Fourth Amended Complaint (the "Motion to Dismiss").[5]  (Doc. No. 65.)  Mallory filed a Response in Opposition to the

---

[3] Ivan Fisher, the estate of Norman Mailer, the estate of Norris Church, and Jack Scovil were terminated as parties on April 7, 2015.  As such, the remaining Defendants are J. Michael Lennon and S & S Publishers.

[4] On November 12, 2014, December 19, 2014, January 5, 2015, March 16, 2015, and March 24, 2015, Mallory filed additional exhibits.  (Doc. Nos. 9, 24, 32, 48, 49.)  The additional exhibits include, *inter alia*, articles written about Mallory, articles and other writings by Mallory, and letters in support of Mallory's work and relationship with Mailer.  The Court noted at the hearing on Defendants' first Motion to Dismiss that it will only consider exhibits filed with the FAC.  (Tr. at 24:24-25:17.)  Mallory did not attach any exhibits to the FAC.  Therefore, the Court will not consider her previously filed exhibits in deciding the Motion to Dismiss.

[5] Defendants' first Motion to Dismiss was denied as moot without prejudice after the FAC was filed.  (Doc. No. 62.)

Motion, and Defendants filed a Reply.  (Doc. Nos. 70, 72.)  For reasons that follow, the Motion

to Dismiss will be granted in part and denied in part.[6]

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set

forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements do not suffice" to

defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550

U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A.

France v. Abbott Labs., 707 F.3d 223, n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp.,

609 F.3d 239, n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  Id.  Applying the principles of Iqbal and Twombly, the Third

Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part

analysis that a district court in this Circuit must conduct in evaluating whether allegations in a

complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must
> plead to state a claim."   Second, the court should identify
> allegations that, "because they are no more than conclusions, are
> not entitled to the assumption of truth."  Finally, "where there are
> well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an
> entitlement for relief."

---

[6]  In deciding the instant Motion to Dismiss, the Court has considered the Fourth Amended
Complaint (Doc. No. 61), the second Motion to Dismiss (Doc. No. 65), the Response in
Opposition to the Motion to Dismiss (Doc. No. 70), the Reply (Doc. No. 72), and the pertinent
sections of Norman Mailer: A Double Life.

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.  "In short, a Motion to Dismiss should be granted if a party fails to allege facts which could, if established at trial, entitle him/her to relief."  Hill v. Cosby, No. CIV. A 15-1658, 2016 WL 247009, at *2 (M.D. Pa. Jan. 21, 2016) (citing Twombly, 550 U.S. at 563 n.8)).

## IV.    ANALYSIS

As noted above, the FAC contains a single Count.  In Count I, Mallory alleges claims of defamation, defamation *per se*, false light, and commercial disparagement-injurious falsehood. In deciding whether the allegations in the FAC are sufficiently pled, the Court will first discuss the standard for analysis of defamation claims under Federal Rule of Civil Procedure 12(b)(6).  It will then reproduce each statement to which Mallory objects, and will analyze her defamation claim on each statement thereafter.  Mallory's defamation *per se*, false light, and commercial disparagement-injurious falsehood claims will be considered after the defamation claim.

**A.  Mallory's Defamation Claim Will Be Dismissed in Part Under Rule 12(b)(6)**

    **i.   Defamation Standard**

To state a claim of defamation under Pennsylvania law,[7] a plaintiff has the burden of proving:

> (1) The defamatory character of the communication;
> (2) Its publication by the defendant;
> (3) Its application to the plaintiff;
> (4) The understanding by the recipient of its defamatory meaning;
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff;
> (6) Special harm resulting to the plaintiff from its publication; and
> (7) Abuse of a conditionally privileged occasion.

Joseph v. Scranton Times, L.P., 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa. Cons. Stat. § 8343(a)).

In a defamation action, the Court must make a threshold determination whether the challenged statements are capable of defamatory meaning.  Gibney v. Fitzgibbon, 547 F. App'x 111, 113 (3d Cir. 2013); see also Byars v. Sch. Dist. of Phila., 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) ("Whether a statement is capable of a defamatory meaning is a question of law for the court.").  "If [they are] not, the claim must be dismissed."  Gibney v. Fitzgibbon, No. CIV. A. 13-7, 2013 WL 1197894, at *3 (E.D. Pa. Mar. 22, 2013), aff'd, 547 F. App'x 111 (3d Cir. 2013); see also Bell v. Mayview State Hosp., 853 A.2d 1058, 1061 (Pa. Super. Ct. 2004) (affirming the dismissal of a complaint where plaintiff's factual averments did not establish defamatory meaning); Richette v. Phila. Magazine, No. 802, 1996 WL 756953, at *2 (Pa. Ct. Com. Pl. Jan. 23, 1996) ("[A] trial court must first determine whether the offending statement, taken in

---

[7] Jurisdiction in this case is based on diversity of citizenship.  A federal district court in a case arising under diversity of citizenship jurisdiction applies state law on substantive legal issues. Schmigel v. Uchal, 800 F.3d 113, 119 (3d Cir. 2015).

context, would be interpreted by a reasonable reader as defamatory. If not, the court should dismiss the action.").

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 215 (Pa. 1981); see also Mathias v. Carpenter, 587 A.2d 1, 2 (Pa. Super. Ct. 1991) (a court must "determine whether the statement was maliciously written or published and tended 'to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession.'"). "It is not enough that the victim of the 'slings and arrows of outrageous fortune', be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society." Scott-Taylor, Inc. v. Stokes, 229 A.2d 733, 734 (Pa. 1967). Thus, for Mallory to prevail, "the statement must do more than merely embarrass or annoy [her]; it must provoke 'the kind of harm which has grievously fractured [her] standing in the community of respectable society.'" Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (quoting Tucker v. Phila. Daily News, 848 A.2d 113, 124 (Pa. 2004)).

In determining whether a statement is capable of defamatory meaning, a court must view the statement in context. The Pennsylvania Supreme Court has stated:

> [W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

Tucker, 848 A.2d at 124 (quoting Thomas Merton, 442 A.2d at 216).

Moreover, "[i]mportantly, only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law[,]" and "[i]n order for an opinion to be deemed capable of defamatory meaning under Pennsylvania law, it must reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion."   Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (internal quotations omitted).   The Third Circuit has explained the distinction between actionable and non-actionable opinions as follows:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea.  If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts.  However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) ("a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection"); Krajewski v. Gusoff, 53 A.3d 793, 803 (Pa. Super. Ct. 2012) (dismissing libel claims as to publications that were "matters of opinion" and "neither reported nor implied facts that were provably false").   Whether a statement is a non-actionable matter of opinion is a question to be resolved by the trial court as a matter of law.  See Mzamane, 693 F. Supp. 2d at 481 ("Whether a statement qualifies as a true opinion or an 'opinion' which implies the existence of undisclosed derogatory facts is a question of law to be resolved by the Court."); Balletta v. Spadoni, 47 A.3d 183, 200 (Pa. Commw. Ct. 2012) (dismissing complaint where allegedly defamatory remarks were deemed non-actionable statements of opinion).

With these principles in mind, the Court will examine each of the allegedly defamatory statements.[8]

## ii.    Statements That Are Capable of Defamatory Meaning [9]

### a)        Defamatory Statement Number 1

First, Mallory cites a portion of the book that she alleges discredits her "self-made achievements attained through hard work by painting a false impression that Plaintiff solely used sex and seduction of celebrities to get ahead, which was not true":

> *Sometime in the mid-1980s, Mailer asked [his agent] to send money to a new mistress,* Carole Mallory, a former cover model for major magazines like *New York* and *Cosmopolitan* who also had small roles in a few films in the 1970s including *Take This Job and Shove It*.  A large poster (which she gave Mailer) for this film, depicting a curvaceous Mallory in a bikini bottom and torn, scanty T-shirt, *rivaled sales of Farrah Fawcett's famous swimsuit poster.*  Jack Scovil, *who handled the transfer of funds,* said that he was "surprised that Norman would get involved with someone like that," referring to Mallory's reputation as a star seducer.  In several interviews, numerous gossip column snippets, and a 2009 memoir, Mallory lists the men that she had "picked up," including Clint Eastwood, Robert De Niro, Warren Beatty, Richard Gere, Sean Connery, Anthony Hopkins, Peter Sellers—she said Brits were "more fun than Americans" . . .

---

[8]  In the FAC, the quotations are not always accurate.  Accordingly, the quotations here are taken from the Biography.  Because, as discussed more thoroughly below, it is necessary to consider the quotes in context, portions of the quotations that were omitted in the FAC are italicized.  Some allegedly defamatory statements are discussed together because of their similarity.

[9]  Defendants also argue that the defamation claim should be dismissed because Mallory, as a limited-purpose public figure, fails to plausibly allege actual malice.  (Doc. No. 65-2 at 17, 25.)  Mallory has conceded that she is a public figure, and alleges in the FAC that the Biography was "intentionally false and/or made with reckless disregard for the truth."  (Doc. No. 70 at 8; Doc. No. 61 ¶ 22.)  As such, Mallory must "prove that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  Tucker, 848 A.2d at 129 (quoting New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964)).  In order to show malice, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).  Because, at this stage, the sources upon which Defendants relied in publishing the Biography are not considered, the Court is unable to determine whether Defendants entertained serious doubts as to the truth of the publication.  For this reason, Plaintiff has plausibly pled that Defendants acted with malice in publishing the portions of the Biography that are quoted.

(Doc. No. 61 at 3 (quoting Lennon, supra, at 592-93).)

Mallory objects to this passage because she maintains that it "paint[s] a false impression that Plaintiff solely used sex and seduction of celebrities to get ahead." (Doc. No. 61 ¶ 13(a).) Defendants argue that the Biography does not defame Mallory by stating that she "picked up" stars because the Biography quotes directly from Mallory's own memoir for that assertion. (Doc. No. 65-2 at 23.) As noted above, the Court will not consider Mallory's memoir for purposes of deciding the Motion to Dismiss. Therefore, it will not determine at this stage whether the memoir contains the quoted language. The Court concludes, however, that the list of men that Mallory "picked up" and the reference to her as a "star seducer" may be reasonably capable of defamatory meaning. See, e.g., Howard v. Town of Jonesville, 935 F. Supp. 855, 861 (W.D. La. 1996) (declining to dismiss defamation claim based on statement that plaintiff was "sleeping with everyone" at her place of employment). Thus, it will deny the Motion to Dismiss Mallory's defamation claim regarding this portion of the Biography.

**b)      Defamatory Statement Number 2**

Mallory alleges that the following excerpts "falsely paint her as venal":

He told Mike Lennon that he learned something about venality from Mallory and used it in the creation of Chloe, the sexy waitress in the opening chapters of *Harlot's Ghost.*
. . .

Mailer found some kind of moral balance in regard to Mallory, enough to continue with her for almost eight years. Like Faust, he was greedy for knowledge and ready to trade punishment to gain it. *"The more prohibited the act, the greater the lure for Mailer," according to Rader. "He wanted to know everything."*

(Id. ¶ 13(f) (quoting Lennon, supra, at 657).) Citing another portion of the Biography, Mallory alleges that Defendant Lennon stated "with malicious intent that Plaintiff was a venal harlot"

11

when he wrote that <u>Harlot's Ghost</u> "was not Norris's favorite book, especially after she learned that Mallory was the model for the sluttish Maine waitress, Chloe."   (Doc. No. 61 ¶ 13(i) (quoting Lennon, <u>supra</u>, at 661).)

Defendants observe that Mallory does not contest that Mailer based a character in his book <u>Harlot's Ghost</u> on her, and "Mallory otherwise fails to allege how or why these statements are defamatory or even false."   (Doc. No. 65-2 at 24.)   Defendants further assert that the statement that Mailer "learned something about venality" from Mallory is no more than "non-actionable hyperbole."   (Doc. No. 65-2 at 29 (citing <u>Greenbelt Co-op. Pub. Ass'n v. Bresler</u>, 398 U.S. 6, 14 (1970) (holding that, regarding the allegedly defamatory use of the word "blackmail" in a newspaper article, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable")).)

The Biography does not specifically refer to Mallory as a "venal harlot," and even if it did, "[a] certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more."   W. Page Keeton, et al., <u>Prosser and Keeton on the Law of Torts</u> § 111, at 776 (5th ed. 1984).   However, courts have found statements implying promiscuity to be reasonably susceptible to defamatory meaning.   <u>See, e.g.</u>, <u>Smith v. Stewart</u>, 660 S.E.2d 822, 831-32 (Ga. Ct. App. 2008) (portrayal of fictional character, allegedly based on plaintiff, as alcoholic and promiscuous was defamatory); <u>House of God Which Is the Church of the Living God, the Pillar & Ground of the Truth Without Controversy, Inc. v. White</u>, 792 So. 2d 491, 495 (Fla. Dist. Ct. App. 2001) (recognizing claim for defamation against pastor who allegedly called plaintiff a slut while standing at altar in front of church parishioners).   Because

the above statements may be defamatory, the Court will deny Defendants' Motion to Dismiss Mallory's defamation claim as to these statements.

### iii.    Statements that Are Not Capable of Defamatory Meaning

#### a)  Defamatory Statement Number 3

Mallory next objects to a passage that she claims inaccurately portrays her relationship with Mailer—as well as her career as a journalist—by implying that she was only interested in Mailer for his money:

> They met, he read some of the manuscript—a chapter describing her night with Warren Beatty—and she left some lipstick on his face as well as her telephone number in Los Angeles.  That summer, when he was in Los Angeles doing publicity for *Tough Guys Don't Dance*, they had their first tryst at the Bel Air Hotel.  *Soon, she was seeing him when he was in L.A. and was in love.  She loved his fame, his wit, his sexual equipment, his detailed writing advice.  "I longed for an affair with a genius," she said.  During their time together, she said, "I noticed that he used words like oxymoron, swath, and sententious.*  Hearing him speak was an education."  She also loved the money *he gave her.  But at one point, her $200-a-week stipend ceased, as Scovil recalled.  "Scott would never authorize giving Carole money unless Norman had authorized it.*  And there was a point where Norman wanted to cut her off and Carole had come up to the office and caused a great scene.  She was doing all kinds of things, saying all kinds of things, and that she deserved the money.["]

(Doc. No. 61 ¶ 13(a) (quoting Lennon, supra, at 593).)

Defendants focus on the part of the passage that describes the "great scene" that Mallory made in Jack Scovil's office, arguing that it is incapable of defamatory meaning because Mallory does not dispute that Mailer paid her a stipend and eventually stopped paying it.  They further aver that "there is nothing defamatory about Mallory getting angry or emotional, especially toward her own agent in his office, whatever the cause."  (Doc. No. 65-2 at 25.)  Indeed, courts in Pennsylvania have held that characterizations more offensive than this one are not capable of defamatory meaning.  See, e.g., Kryeski v. Schott Glass Techs., Inc., 626 A.2d 595, 600 (Pa. Super. Ct. 1993) (statement that plaintiff was "crazy" and "emotionally unstable" not capable of

defamatory meaning); <u>Richette</u>, 1996 WL 756953, at *2 (dismissing libel claim because statements that plaintiff-judge threw "a hissy fit," was "a horse's ass," and "was always in a world of confusion" were not capable of defamatory meaning).

As to Mallory's claim that this passage portrays her as only interested in Mailer for his money, the portions of the paragraph that Mallory failed to reproduce in the FAC clearly describe her love for him, and especially for "his fame, his wit, his sexual equipment, his detailed writing advice." Lennon, <u>supra</u>, at 593. Given the context of the statement and the portrayal of the affair in the Biography, it is clear that there was more to Mallory's relationship with Mailer than money. Thus, this statement is not capable of defamatory meaning.

### b)      Defamatory Statement Number 4

Mallory avers that the following passage "maliciously disqualif[ies]" her by intimating that she exchanged sex for Mailer's personal and professional assistance:

> Another way of helping Mallory financially was to give her interviews, which he did on several occasions. *Through him, she also met other writers and celebrities. Joseph Heller, Erica Jong, Isabella Rossellini, and Kurt Vonnegut are some of the interviewees she mentions in her memoir.* One of her interviews with Mailer included [Gore] Vidal, and was the cover feature in the May 1991 *Esquire* (he and Mailer had made up by this time), but Mailer said it was a weak piece, even after he had tweaked it.
> . . .
> *Among Mailer's close friends, the affair caused consternation, but he waved off every warning. The relationship was based on passion,* according to Mailer's lawyer, Ivan Fisher. *"It was a huge part of his being. And a huge part of his passion was sex.* And his relationship with Mallory was 100 percent sexual. Period. There wasn't the teeniest, tiniest nanogram of anything other than sex involved there. If you are looking for an idea, read her book . . . *Flash*, yes. And you'll know exactly what this affair was about. *It wound up causing [Norris] enormous pain."*

(Doc. No. 61 ¶ 13(c) (quoting Lennon, <u>supra</u>, at 594).)

Defendants assert that the comment that Mailer's relationship with Mallory was "100 percent sexual" is not defamatory because, read in context, it does not harm her reputation. They

argue that because the book also describes the "collaborative literary relationship, Mallory's published interviews of Mailer and others he introduced her to, the love Mallory felt for Mailer, and the 'moral balance' Mailer felt in his relationship with Mallory," a reader would understand that the relationship was multifaceted, "with 'passion' being but one element." (Doc. No. 65-2 at 22 (citing Lennon, supra, at 593-94, 596-97).)

Omitted portions of the quote reproduced in the FAC give context to the "100 percent sexual" statement. In the same paragraph, Defendant Lennon wrote that the "relationship was based on passion" and "was a huge part of [Mailer's] being." Lennon, supra, at 594. In the previous paragraph, the Biography describes the ways in which Mailer helped Mallory professionally. See id. at 593-94 ("Joseph Heller, Erica Jong, Isabella Rossellini, and Kurt Vonnegut are some of the interviewees she mentions in her memoir."). Therefore, read in context, this portion of the Biography cannot be said to have "grievously fractured" Mallory's standing in the community, and is not defamatory. See Graboff, 744 F.3d at 136.

Moreover, Fisher's statement that the relationship was "100 percent sexual" is "part of a subjective assessment of Mailer's motivations for his affair with Mallory." (Doc. No. 65-2 at 27.) The "100 percent sexual" comment is an opinion based on passion and sex being "a huge part of [Mailer's] being" and based on Flash, Mallory's novel about a female flasher. See Vurimindi v. Fuqua Sch. of Bus., No. CIV. A 10-234, 2010 WL 3419568, at *12 (E.D. Pa. Aug. 25, 2010), aff'd, 435 F. App'x 129 (3d Cir. 2011) (alleged statements that plaintiff would benefit from having sex were non-actionable opinions); Purcell v. Ewing, 560 F. Supp. 2d 337, 342 (M.D. Pa. 2008) (statements that plaintiff looked like "someone accused of child molestation" and that he was a "pervert to look out for" were non-actionable statements of opinion). Accordingly, this portion of the Biography is not capable of defamatory meaning.

### c)        Defamatory Statement Number 5

Mallory objects to the following passage because she claims Lennon intentionally failed to mention that "her work was and still is sold and published."  (Doc. No. 61 ¶ 13(d).)

> Barbara[, an editor for S & S Publishers,] met Mallory through her brother.  "He sicced her on me when I was working at Simon and Schuster," she recalled.  "I didn't ask any questions, but I guessed he was trying to buy her off because she presented me with a couple of manuscripts which were just ghastly."  She realized that there was nothing she could do with Mallory's work.  "I wished I could because I figured this would be one way to help him—one of the manuscripts was about all the men she had slept with.  Norman was not in it.  I figured maybe he had asked her to keep him out of it."

(Id. (quoting Lennon, supra, at 595).)  She also alleges that in another passage, Defendant Lennon "maliciously provide[d] inaccurate information regarding Plaintiff, which was not true."  (Id.)  The passage reads: "Mailer had recommended Mallory for a small role in the film [*Tough Guys Don't Dance*], but casting director Bonnie Timmermann and producer Tom Luddy turned her down."  (Id. ¶ 13(g) (quoting Lennon, supra, at 656).)

Mallory appears to contend that, by quoting an editor who declined to publish Mallory's work, Defendants intentionally omitted reference to her continued success as an author.  (Id. ¶ 13(d).)  However, as Defendants rightly note, Mallory does not indicate what portion of the quoted statement is defamatory.  (Doc. No. 65-2 at 16.)  Given the context of the quoted material—including the fact that the Biography references her as the author of Loving Mailer, Flash, and numerous published interviews—it cannot reasonably be considered defamatory.

Defendants also argue that Mallory fails to allege the defamatory character of the statement, "Mailer had recommended Mallory for a small role in the film *Tough Guys Don't Dance*, but [the casting director and producer] turned her down."  (Doc. No. 61 ¶ 13(g) (quoting Lennon, supra, at 625).)  They contend that Mallory has failed to allege how the statement is defamatory, and that while the statement is "at most annoying and embarrassing," it is not

defamatory.   (Doc. No. 65-2 at 24.)   The Court agrees that while the statement may cause embarrassment, it has not caused Mallory to suffer "the kind of harm which has grievously fractured [her] standing in the community of respectable society."   See Graboff, 744 F.3d at 136 (quoting Tucker, 848 A.2d at 124).

### d)        Defamatory Statement Number 6

Next, Mallory lists more examples of quotations that allegedly depict her relationship with Mailer "not as a talented professional but rather a ruse based on sex to advance her career." (Doc. No. 61 ¶ 13(e).)

> When asked about her motives in 2006, Mailer said, "She was totally on the make."  *Fisher's interpretation notwithstanding, Mailer had more than one reason for continuing his relationship.*
> . . .
>
> Mallory was unlike anyone he had known before.  He was fascinated by her crassness and amazed by her promiscuity, *which seemed to match his own.  There was so much to learn.*
> . . .
>
> *Mallory says that she was in love with him and not merely interested in what he could do for her.  Perhaps she was.*  She knew him but superficially, however. Convinced that he was an alcoholic, she took him to one of her AA meetings.

(Id. ¶ 13(e) (quoting Lennon, supra, at 595-96).)

When read in context, as is required, the challenged passages lack defamatory meaning. See Polsby v. Spruill, No. CIV. 96-1641, 1997 WL 680550, at *8 (D.D.C. Aug. 1, 1997), aff'd, No. 97-7148, 1998 WL 202285 (D.C. Cir. Mar. 11, 1998) (finding an allegedly defamatory account in a novel of a romantic relationship involving plaintiff, when viewed in the context of the "entire story," would not lower plaintiff's estimation in the community and therefore was not defamatory).   Mallory does not cite or object to the part of the quote that states that her promiscuity "seemed to match" that of Mailer, and that Mailer had "so much to learn."  Lennon,

supra, at 595.  Furthermore, the Biography portrays the professional aspect of the relationship by discussing her published interviews with Mailer and other writers, as well as the writing advice that Mailer provided. It also portrays Mallory's love for Mailer.  See Lennon, supra, at 593 ("Soon, she was seeing him when he was in L.A. and was in love.  She loved his fame, his wit, his sexual equipment, his detailed writing advice.").

These statements, like the others, would not grievously fracture Mallory's standing in the community.  See Graboff, 744 F.3d at 136.  Accordingly, Mallory has not met her burden of showing they are capable of defamatory meaning.

e)        **Defamatory Statement Number 7**

Finally, Mallory alleges that Defendant Lennon "maliciously fabricate[d] a conversation between Plaintiff and Norris incorrectly portraying Plaintiff as merely using Mailor [sic] for money."  (Doc. No. 61 ¶ 13(h).)  In this passage, Defendant Lennon wrote:

> *When* Harlot's Ghost *was published, there were several book events in New York.* At the Random House party at the "21" Club *(scene of Cal and Harry Hubbard's memorable lunch in the novel), hosted by publisher Harry Evans on October 31,* Carole Mallory showed up.  She was "shockingly brazen," Norris said, and kept bringing photographers over to take her picture with Mailer.  She seemed to be taunting Norris, or seeking to create a scene or a physical altercation.  Norris ignored her, and then told her quietly that she might as well enjoy herself because "she had gotten the last nickel she was going to get out of Norman."  Norris was correct: Mallory had lost her sugar daddy.

(Id. (quoting Lennon, supra, at 657).)

Again, Defendants allege that Mallory has failed to meet her burden of showing the defamatory character of the quote.  Mallory alleges in the FAC that the quote "incorrectly portray[s] Plaintiff as merely using Mailor [sic] for money," but she does not dispute that Mailer paid her a regular stipend and eventually stopped paying her.  While this statement may have caused Mallory embarrassment or irritation, given the context, it cannot reasonably be said to

cause harm that "grievously fractured [her] standing in the community of respectable society." See Graboff, 744 F.3d at 136.

Ultimately, though the above five statements may have embarrassed Mallory, when read in context of the entire 947-page Biography, they have not so lowered Plaintiff in the estimation of the community as to constitute defamatory language.  See Gibney, 547 F. App'x at 113 (a challenged statement must "do more than merely annoy or embarrass the purported victim[,]" it must so harm his reputation "as to lower him in the estimation of the community or deter third parties from associating" with him).  For all of the above reasons, Mallory has not surpassed the threshold requirement of showing that the statements are capable of defamatory meaning, and the Court will dismiss her defamation claim as to Statements 3-7.

**B. Defendants' Motion to Dismiss Will Be Granted as to Mallory's Commercial Disparagement-Injurious Falsehood Claim, and Denied as to her Defamation *Per Se* and False Light Claims**

In addition to a claim of defamation, Mallory alleges claims of defamation *per se*, false light, and commercial disparagement-injurious falsehood.  Because she has not plausibly alleged the requisite elements of commercial disparagement-injurious falsehood, this claim will be dismissed.  However, she has plausibly pled the defamation *per se* and false light claims, and they will not be dismissed.  Each cause of action will be discussed in turn.

### i.   Commercial Disparagement-Injurious Falsehood

First, Mallory alleges commercial disparagement-injurious falsehood.  (Doc. No. 61 at 6.).  Defendants do not address this claim in their Motion to Dismiss.  In Pennsylvania, the elements of the tort of commercial disparagement are:

> (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does result; and (4) the publisher either knows

that the statement is false or acts in reckless disregard of its truth or falsity (actual malice).

Brooks Power Sys., Inc v. Ziff Commc'ns Inc., No. CIV. A. 93-3954, 1994 WL 444725 at *2 (E.D. Pa. Aug. 17, 1994).   The Brooks Power court further explained that "[a] claim for commercial disparagement protects economic interests related to the marketability of goods," whereas "defamation involves the reputation of persons, not products."[10]  Id.

Though Mallory claims she suffered "financial loss and lost opportunity" as a result of the alleged defamation, she does not specify what, if any, pecuniary loss resulted from the publication of the Biography.  See Carter v. Pook & Pook, LLC., No. CV 14-5715, 2016 WL 337022, at *8 (E.D. Pa. Jan. 27, 2016) (dismissing commercial disparagement claim for failure to plausibly plead pecuniary loss); Explorologist Ltd. v. Sapient, No. CIV. 07-1848, 2007 WL 3146582, at *1 (E.D. Pa. Oct. 29, 2007) ("because special damages—an element of [commercial disparagement]—were not pleaded with specificity, defendant's motion to dismiss will be granted").  Her allegation of "financial loss and lost opportunity" is conclusory and essentially a repetition of an element of the cause of action.  Because she has not plausibly pled economic loss, but rather focuses on damage to her reputation, Mallory's allegation of commercial disparagement-injurious falsehood is without merit.

### ii.  Defamation *Per Se*

Under Pennsylvania law, "[d]efamation *per se* can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct."

---

[10] The Restatement (Second) of Torts refers to this tort as "injurious falsehood."  Restatement (Second) of Torts § 623A (1977); see also Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 246 (Pa. 2002).

<u>Synygy, Inc. v. Scott-Levin, Inc.</u>, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999), <u>aff'd sub nom.</u>,

<u>Synygy, Inc. v. Scott-Levin</u>, 229 F.3d 1139 (3d Cir. 2000) (quoting <u>Clemente v. Espinosa</u>, 749 F.

Supp. 672, 677 (E.D. Pa. 1990)).  Defendants argue that this case is "far removed from the kind

of sexual activities that have been recognized as defamatory, such as false accusation of adultery

or serious sexual misconduct."  (Doc. No. 65-2 at 21.)  The Restatement (Second) of Torts

provides the following with regard to "serious sexual misconduct":

> The rule stated in this Section has been generally applied to any statement that imputes any form of unchastity to a woman, married or single, irrespective of whether the conduct charged constitutes a criminal offense. The rule applies to a statement charging a woman with specific acts of adultery, fornication or any other form of sexual intercourse with a man other than her husband, as well as to general charges of unchaste conduct. It does not apply to mere imputations of immodesty that do not imply unchaste conduct.

Restatement (Second) of Torts § 574 (1977).

In support of this claim, Mallory alleges that the Biography "essentially claims self-made

Plaintiff, Carole Mallory as a contemptible prostitute whose otherwise long-term both loving and

professional relationship with Mailor [sic] as instead strictly sexual in exchange for money,

opportunity, and publicity."  (Doc. No. 61 ¶ 18.)  The Court assumes Mallory is alleging that the

statements cited above impute "serious sexual misconduct."

Mallory concedes that she was in a romantic relationship with a man who was not her

husband, but alleges that certain statements in the Biography portray her as a woman who

exchanged sex for money and opportunity.  As such, certain statements in this case may rise to

the level of "serious sexual misconduct" under Pennsylvania law.  <u>See</u> <u>Doe v. Simone</u>, No. CIV.

A. 12-5825, 2013 WL 3772532, at *5 (D.N.J. July 17, 2013) (statements that plaintiff had

committed adulterous sexual conduct, and was a "slut," the "queen of sluts," and a "whore" were

capable of being defamatory *per se*); <u>Bryson v. News Am. Publ'ns, Inc.</u>, 672 N.E.2d 1207, 1215

(Ill. 1996) (holding that article in magazine's "fiction" section referring to character with plaintiff's last name as "slut" and implying that plaintiff was "unchaste" individual was capable of defamation *per se*); Walia v. Vivek Purmasir & Assocs., Inc., 160 F. Supp. 2d 380, 394 (E.D.N.Y. 2000) (statements referring to plaintiff as a "whore" and "slut" may constitute defamation *per se* because they impute unchastity to plaintiff).  Because some statements in the Biography may constitute defamation *per s*e, the Court will not dismiss Mallory's defamation *per se* claim at this stage.

### iii. False Light

Finally, Mallory alleges the state tort of false light.  Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action.  Graboff v. Colleran Firm, No. CIV. A. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013), aff'd, 744 F.3d 128 (3d Cir. 2014) (citing Fanelle v. LoJack Corp., 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000)).

To plead a claim for false light under Pennsylvania law, a plaintiff must allege facts showing that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity."  Graboff, 744 F.3d at 136. Specifically, "[a] plaintiff can establish falsity by showing that a defendant 'selectively printed or broadcast true statements or pictures in a manner which created a false impression.'"  Id. (quoting Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1189 (1988)).  Even if "a publication is literally true, 'discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed.'"  Id. (quoting Larsen, 543 A.2d at 1189).  "Ultimately, whether the communication is capable of bearing a particular meaning which is highly offensive

to a reasonable person is a question for the Court."  <u>Savely v. MTV Music Television</u>, No. CIV.

A. 11-1021 SDW, 2011 WL 2923691, at *5 (D.N.J. July 18, 2011) (internal quotations omitted).

The Restatement (Second) of Torts Section 652E, comment b states the following in

regard to the requirement that a statement be "highly offensive":

> The rule stated in this Section applies only when the publicity given to the plaintiff has placed him in a false light before the public, of a kind that would be highly offensive to a reasonable person.  In other words, it applies only when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity.  Complete and perfect accuracy in published reports concerning any individual is seldom attainable by any reasonable effort, and most minor errors, such as a wrong address for his home, or a mistake in the date when he entered his employment or similar unimportant details of his career, would not in the absence of special circumstances give any serious offense to a reasonable person.  The plaintiff's privacy is not invaded when the unimportant false statements are made, even when they are made deliberately.  It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy.

Restatement (Second) of Torts § 652E cmt. b.

The torts of defamation and false light invasion of privacy are similar but have key

differences.  As one court in this District explained:

> First, false light requires only proof of the falseness of the communication; it does not require harm to reputation or any other social consequences inherent in a defamation action.  Thus, where a publication is false and offensive to plaintiff but might not harm the reputation of plaintiff, plaintiff would have a cause of action for false light, but likely would not be able to proceed with a defamation claim.  Second, false light requires scienter, or at least reckless disregard, whereas defamation claims not involving public figures or matters of public concern require only a showing of negligence.  Third, the communication must be highly offensive to a reasonable person in a false light claim, while there is no such requirement in a defamation suit. Fourth, false light requires "publicity," meaning widespread dissemination, as opposed to mere "publication" under defamation.

Fanelle v. Lojack Corp., No. CIV. A. 99-4292, 2000 WL 1801270, at *9 (E.D. Pa. Dec. 7, 2000) (internal citations omitted).  Thus, "commentators have characterized false light as 'the right to be left alone,' whereas defamation protects one's interest in a good reputation."  Id.

Mallory contends that the "false light in which Defendants portrayed Plaintiff, Carole Mallory would be highly offensive to a reasonable person," and that "Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed."  (Doc. No. 61 ¶¶ 23-24.)  In support of her claim, Mallory contends, "stating that Plaintiff was essentially a venal whore whose relationship with Mailor [sic] was solely for money and professional advancement is not only untrue but additionally places Plaintiff in a false light when her own achievements as well as loving relationship with Maior [sic] have been pleaded."  (Doc. No. 70 at 11.)

Defendants argue that "Mallory essentially alleges that the [Biography] portrayed her in an unflattering light, but that is insufficient to find a 'major misrepresentation' that would be 'highly offensive to a reasonable person.'"  (Doc. No. 65-2 at 40.)  They further argue that the facts Mallory pled do not demonstrate a claim for false light because she has not plausibly alleged the falsity of the statements, that the statements would be "highly offensive to a reasonable person," or that Defendants acted with actual malice in publishing the statements.  (Id. at 39-40.)

Accepting Mallory's allegations as true, the Court finds that Mallory has sufficiently pled a claim of false light.  In addition, analyzing whether Defendants "[knew] that the plaintiff, as a reasonable [woman], would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity,'" as well as whether Defendants "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter" will, at a minimum, require

consideration of Mallory's memoir.  See Restatement (Second) of Torts § 652E cmt.b.  Because the content of Loving Mailer cannot be considered by the Court at this juncture, and because, based on the factual allegations in the FAC, the elements of a false light claim are satisfied, the Motion to Dismiss the false light claim will be denied.

## V.      AMENDING THE COMPLAINT A FIFTH TIME WOULD CAUSE UNDUE DELAY

In her Opposition to Defendants' Motion to Dismiss, Mallory requests, in the alternative, that the Court grant her leave to amend the Complaint a fifth time.  Mallory states:

> In the sur-alternative, Plaintiff respectfully requests leave to amend upon this Honorable Court's opinion (i.e., consistent with Runnion [ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana, 786 F.3d 510 (7th Cir. 2015)], a pleader need not accept Defendants' notice of claimed pleading's defects – only this Honorable Court's towards [sic] post-opinion amendment).  Otherwise, the complaint should be dismissed without prejudice to state court – owing to Pennsylvania's unique defamation analyses.

(Doc. No. 70 at 12.)

The United States Supreme Court has held that "leave shall be freely given" to amend in the appropriate circumstances.  Foman v. Davis, 371 U.S. 178, 182 (1962).  A "court may refuse a motion for leave to amend only in limited circumstances, such as when the amendment would cause undue delay; is offered in bad faith or with dilatory motive; or if the amendment is futile." Foster v. Pitney Bowes Corp., No. CIV. A. 11-7303, 2013 WL 1500667, at *3 (E.D. Pa. Apr. 12, 2013) (citing Am. Tel. & Tel. Co. v. Marstan Indus., Inc. v. N. Telecom, Inc., No. CIV. 93-2961, 1994 WL 276269, at *1 (E.D. Pa. June 21, 1994)).

Here, granting Mallory leave to amend the Complaint a fifth time would cause undue delay.  As the Court noted at the hearing on Defendants' first Motion to Dismiss, the Complaint was first filed in November 2014.  In granting Mallory's request to amend the Complaint a fourth time, the Court stated, "I think the fair thing to do is to grant leave to Ms. Mallory to file a Fourth

25

Amended Complaint.  But I would not allow another complaint beyond the fourth, Mr. Weisberg."  (Tr. at 24:15-17.)  Mr. Weisberg, Mallory's attorney, replied: "I will not ask, your Honor."  (Tr. at 24:18.)  Accordingly, Mallory's request for leave to amend the FAC will be denied.

## VI.    CONCLUSION

For the foregoing reasons, the FAC will be granted in part and denied in part.  An appropriate Order follows.