IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAROLE MALLORY,                    :
                                   :
            Plaintiff,             :
                                   :
      v.                           :           CIV. NO. 14-5702-JHS
                                   :
SIMON & SCHUSTER, INC.             :
                                   :
      and                          :
                                   :
J. MICHAEL LENNON,                 :
                                   :
            Defendants.            :

CORRECTED*
MEMORANDUM OF LAW IN SUPPORT OF SIMON & SCHUSTER, INC.
AND J. MICHAEL LENNON'S MOTION FOR SUMMARY JUDGMENT

Andrew A. Chirls
Christina Capobianco
FINEMAN KREKSTEIN & HARRIS P.C.
Ten Penn Canter
1801 Market Street, Suite 1100
Philadelphia, PA 19103
215-893-9300
achirls@finemanlawfirm.com
ccapobianco@finemanlawfirm.com

Elizabeth A. McNamara (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, NY 10019
212-489-8230
lizmcnamara@dwt.com

Sean M. Sullivan (pro hac vice)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, California 99017-2566
213-633-8644
seansullivan@dwt.com

*Counsel for defendants Simon & Schuster,
Inc. and J. Michael Lennon*

*This memorandum was filed on
December 22, 2016, without pagination.
It is refiled with pagination on
December 27, 2016

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    The Parties ................................................................................................ 3

    B.    *Norman Mailer: A Double Life* ............................................................... 4

    C.    Proceedings ............................................................................................... 6

        1.    Alleged Defamatory Statement Number 1 ................................... 7

        2.    Alleged Defamatory Statement Number 2 ................................... 8

        3.    Other Statements Found Not To Be Capable of Defamatory Meaning ...... 8

            a.    Statement Number 3 ..................................................... 9

            b.    Statement Number 4 ................................................... 10

            c.    Statement Number 5 ................................................... 10

            d.    Statement Number 6 ................................................... 10

            e.    Statement Number 7 ................................................... 11

        4.    Plaintiff's Defamation *Per Se* and False Light Claims ........................... 12

    D.    Sourcing, Writing and Publication of the Book ...................................... 13

ARGUMENT ................................................................................................................... 16

I. SUMMARY JUDGMENT IS APPROPRIATE HERE ................................................. 16

II. ACCURATELY QUOTING MALLORY'S OWN STATEMENTS CAN NOT DEFAME HER ...... 18

    A.    In Context, The Statement That Plaintiff "Picked Up" Certain Stars Is Not Capable of Defamatory Meaning Because It Is an Accurate Quote of Mallory ... 18

    B.    The Statement That Plaintiff Is a "Star Seducer" Is Non-Actionable Opinion Based On Mallory's Own Statements ................................................................. 22

III. THERE IS NO TRIABLE ISSUE OF ACTUAL MALICE FOR BOTH THE
   DEFAMATION AND FALSE LIGHT CLAIMS ................................................................ 24

    A.    Mallory Is A Limited Purpose Public Figure Who Must Prove Actual Malice.... 24

    B.    Actual Malice Is An Exacting Standard............................................................. 25

    C.    Actual Malice Governs Both Mallory's Defamation and False Light Claims...... 25

    D.    The Undisputed Evidence Precludes a Finding of Actual Malice ...................... 27

        1.    Lennon's Failure to Interview Mallory Is Insufficient to Show Actual
      Malice ................................................................................................ 27

        2.    The Undisputed Evidence Shows That Lennon & S&S Did Not Know
      Any Of the Statements Were False and Did Not Print Them with
      Reckless Disregard of Their Falsity......................................................... 31

        3.    Evidence of Ill Will Is Insufficient to Show Actual Malice and The
      Evidence Shows Lennon and S&S Did Not "Maliciously" Publish
      Negative Statements About Mallory........................................................... 35

IV. THERE IS NO TRIABLE ISSUE THAT PLAINTIFF HAS FAILED TO ESTABLISH
   A CAUSE OF ACTION FOR FALSE LIGHT ..................................................... 37

CONCLUSION.................................................................................................... 40

DWT30845529v3

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................................17

*Beckley Newspapers Corp. v. Hanks*,
    389 U.S. 81, 82-83 (1967) ................................................................................35

*Beverly Enters., Inc. v. Trump*,
    182 F.3d 183 (3d Cir. 1999)..............................................................................22

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)........................................................27, 35

*Bose Corp. v. Consumers Union*,
    466 U.S. 485, 510–11 (1984).............................................................................26

*Celotex v. Catrett*,
    477 U.S. 317 (1986).............................................................................................16

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ...........................................................................21

*Coughlin v. Westinghouse Broad. & Cable, Inc.*,
    603 F. Supp. 377 (E.D. Pa. 1985) ....................................................................26

*Crescenz v. Penguin Grp. (USA), Inc.*,
    561 F. App'x 173 (3d Cir. 2014) ......................................................29, 30, 31, 37

*Damon v. Moore*,
    520 F.3d 98 (1st Cir. 2008)................................................................................20

*Diario El Pais, S.L. v. The Nielsen Co. (US), Inc.*,
    No. 07CV11295(HB), 2008 WL 4833012 (S.D.N.Y., Nov. 6, 2008) .................31

*Doe v. Luzerne Cnty.*,
    660 F.3d 169 (3d Cir. 2011)..............................................................................17

*Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*,
    No. CIV.A. 3:12-1886, 2013 WL 5466149 (M.D. Pa. Sept. 30, 2013)..........26, 27

*Eastwood v. National Enquirer, Inc.*,
    123 F.3d 1249 (9th Cir. 1997) ...........................................................................25

*Egiazaryan v. Zalmayev,*
    No. 11 Civ. 2670(PKC), 2011 WL 6097136 (S.D.N.Y., Dec. 7, 2011) ................................35

*Fanelle v Lojack Corp.,*
    No CIV. A. 99-4292, 2000 WL 1801270 (E.D. Pa. Dec. 7, 2000)........................................9

*Garrison v. Louisiana,*
    379 U.S. 64 (1964)............................................................................................................25

*Geiger v. Dell Pub. Co.,*
    719 F.2d 515 (1st Cir. 1983)............................................................................................36

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974)......................................................................................................24, 25

*Graboff v. Colleran Firm,*
    744 F.3d 128 (3d Cir. 2014)......................................................................................21, 38, 39

*Gray v. York Newspapers, Inc.,*
    957 F.2d 1070 (3d Cir. 1992)............................................................................................17

*Hardin v. Santa Fe Reporter, Inc.,*
    745 F.2d 1323 (10th Cir. 1984) .......................................................................................28

*Harte-Hankes Communications, Inc. v. Connaughton,*
    491 U.S. 657 (1989).....................................................................................................28, 29

*Hotchner v. Castillo–Puche,*
    551 F.2d 910 (2d Cir. 1977)...............................................................................................36

*Janklow v. Newsweek, Inc.,*
    788 F.2d 1300 (8th Cir. 1986) ..........................................................................................21

*Johnson v Overnite Transp. Co.,*
    19 F.3d 392 (8th Cir. 1994) ..............................................................................................20

*Kaucher v. Cnty. of Bucks,*
    455 F.3d 418 (3d Cir. 2006)..............................................................................................17

*Kendall v. Daily News Pub. Co.,*
    716 F.3d 82 (3rd Cir. 2013) ..............................................................................................25

*The Knit With v. Knitting Fever, Inc.,*
    No. Civ.A. 08-4221, 2010 WL 3792200 (E.D. Pa. Sept. 28, 2010) .......................................21

*Lohrenz v. Donnelly,*
    223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd* 350 F.3d 1272 (D.C. Cir. 2003)............................28

*Lohrenz v. Donnelly,*
  350 F.3d 1272 (D.C. Cir. 2003) ................................................................................36

*Mallory v. S & S Publishers,*
  168 F. Supp. 3d 760, 768 ...............................................................................6, 24, 33

*Mallory v. S & S Publishers,*
  168 F. Supp. 3d 760, 768, n.9 (E.D. Pa. 2016) ...........................................................2

*Masson v. New Yorker Magazine, Inc.,*
  501 U.S. 496 (1991) .................................................................................................25

*Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.,*
  674 F.3d 369 (4th Cir. 2012) ....................................................................................35

*McManus v. Doubleday & Co.,*
  513 F. Supp. 1383 (S.D.N.Y.1981) ...........................................................................36

*Medure v. New York Times Co.,*
  60 F. Supp. 2d 477 (W.D. Pa. 1999) .........................................................................29

*Mendoza v. Gribetz Intern., Inc.,*
  No. 10–1904, 2011 WL 2117610 (E.D. Pa. May 27, 2011) ......................................17

*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974) .................................................................................................21

*Milkovich v. Lorain Journal Co.,*
  497 U.S. 1 (1990) ...............................................................................................17, 22

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ..............................................................................................7, 26

*Parisi v. Sinclair,*
  845 F. Supp. 2d 215 (D.D.C. 2012) ..........................................................................31

*Park v. Veasie,*
  2012 WL 1382222 (M.D. Pa. Apr.20, 2012) ............................................................26

*Philadelphia Newspapers, Inc. v. Hepps,*
  475 U.S. 767 (1986) .................................................................................................17

*Purcell v. Ewing,*
  560 F. Supp. 2d 337 (M.D. Pa. 2008) .......................................................................23

*Remick v. Manfredy,*
  238 F.3d 248 (3rd Cir. 2001) .........................................................................18, 19, 22

*Rockwell v. Allegheny Health, Educ. & Research Found.*,
   19 F. Supp. 2d 401 (E.D. Pa. 1998) ....................................................................24

*Schatz v. Republican State Leadership Committee*,
   669 F.3d 50 (1st Cir. 2012) ...............................................................................27

*Seale v. Grammercy Pictures*,
   964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998) ...............26

*Seidman v. Minn. Mut. Life. Ins. Co.*,
   40 F. Supp. 2d 590 (E.D. Pa. 1997) ...................................................................27

*Smith v School Dist.*,
   112 F. Supp. 2d 417 (E.D. Pa. 2000) .................................................................21

*Sprague v. Porter*,
   No. 1649 EDA 2013, 2014 WL 10803063 (Pa. Super. Ct. Aug. 26, 2014)...........26, 35, 38, 40

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)...............................................................................25, 27, 28

*Stern v. Cosby*,
   645 F. Supp. 2d 258 (S.D.N.Y. 2009).................................................................36

*Synthes, Inc. v. Emerge Med., Inc.*,
   No. CIV.A. 11-1566, 2014 WL 2616824 (E.D. Pa. June 11, 2014) .......................21

*Taha v. Bucks Cty.*,
   No. CV 12-6867, 2015 WL 9489586 (E.D. Pa. Dec. 30, 2015) ............................27

*Thomas v Pearl*,
   998 F.2d 447 (7th Cir. 1993) .............................................................................20

*Van Buskirk v Cable News Network, Inc.*,
   284 F.3d 977 (9th Cir. 2002) .............................................................................20

*Vandenburg v. Newsweek, Inc.*,
   507 F.2d 1024 (5th Cir.1975) ............................................................................31

*Vitale v. National Lampoon, Inc.*,
   449 F. Supp. 442 (E.D. Pa. 1978) ......................................................................24

*Vurimindi v. Fuqua School of Business*,
   No. 10-234, 2010 WL 3419568 (E.D. Pa. Aug. 25, 2010) ....................................23

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ...........................................................................21

**State Cases**

*Baker v. Lafayette Coll.*,
    532 A.2d 399 (Pa. 1987) ......................................................................................................19, 22

*Blackwell v. Eskin*,
    916 A.2d 1123 (Pa. Super. Ct. 2007) .........................................................................................28

*Brophy v. Philadelphia Newspapers, Inc.*,
    422 A.2d 625 (Pa. Super Ct. 1980) ............................................................................................22

*Copp v. Paxton*,
    45 Cal. App. 4th 829 (Ct. App. 1996) .......................................................................................25

*Corabi v. Curtis Publ. Co.*,
    273 A.2d 899 (Pa. 1971) ............................................................................................................24

*Curran v. Phila. Newspapers. Inc.*,
    546 A.2d 639 ..............................................................................................................................26

*Dunlap v. Phila. Newspapers, Inc.*,
    448 A.2d 6 (Pa. Super. Ct. 1982) ...............................................................................................39

*Fitzpatrick v. Philadelphia Newspapers, Inc.*,
    567 A.2d 684 (Pa. Super. Ct. 1989) ...........................................................................................29

*Green v. Mizner*,
    692 A.2d 169 (Pa. Super. Ct. 1997) ...........................................................................................24

*Immuno AG. v. Moor-Jankowski*,
    145 A.D.2d 114, 134, 537 N.Y.S.2d 129, 141 (N.Y. App. Div. 1989), *aff'd*,
    549 N.E.2d 129, 134 (N.Y. 1989), *vacated*, 497 U.S. 1021 (1990), *adhered to*
    *on remand*, 567 N.E.2d 1270 (N.Y. 1991), *cert. denied*, 500 U.S. 954 (1991) ......................23

*Jones v. City of Philadelphia*,
    73 Pa. D. & C.4th 246 (Pa. Com. Pl. Phila. Cty. 2005), *aff'd*, 893 A.2d 837
    (Pa. Commw. Ct. 2006) .......................................................................................................38, 40

*Krajewski v. Gusoff*,
    53 A.3d 793 (Pa. Super. Ct. 2012), *appeal dismissed as moot*, 84 A.3d 1057
    (Pa. 2014) ..............................................................................................................................17, 22

*Kryeski v. Schott Glass Techs., Inc.*,
    626 A.2d 595 (Pa. Super. Ct. 1993) .....................................................................................18, 23

*Larsen v. Phila. Newspapers, Inc.*,
    543 A.2d 1181 (Pa. Super. 1988) ...............................................................................................38

*Lewis v. Philadelphia Newspapers, Inc.*,
  833 A.2d 185 (Pa. Super. Ct. 2003)......................................................................29, 35

*Parano v. O'Connor*,
  641 A.2d 607 (Pa. Super. Ct. 1994)......................................................................38, 40

*Richette v. Philadelphia Magazine*,
  No. 802, 1996 WL 756954 (Pa. Com. Pl. May 28, 1996) .................................38, 40

*Rush v. Philadelphia Newspapers, Inc.*,
  732 A.2d 648 (Pa. Super. Ct. 1999).............................................................................26

*Santillo v. Reedel*,
  634 A.2d 264 (Pa. Super. Ct. 1993)......................................................................38, 39

*Scott-Taylor, Inc. v. Stokes*,
  229 A.2d 733 (Pa. 1967)...............................................................................................18

*Sprague v. Walter*,
  656 A.2d 890 (Pa. Super. Ct. 1995).............................................................................35

*Strickland v. Univ. of Scranton*,
  700 A.2d 979 (Pa. Super. Ct. 1997).............................................................................40

*Thomas Merton Ctr. v. Rockwell Int'l Corp.*,
  442 A.2d 213 (Pa. 1981)........................................................................................18, 19

*Tucker v. Philadelphia Daily News*,
  848 A.2d 113 (Pa. 2004).............................................................................18, 19, 27, 28

*Vogel v. W.T. Grant Co.*,
  327 A.2d 133 (Pa. 1974)...............................................................................................38

**Rules**

Fed. R. Civ. P. 56(e)(2)..................................................................................................17

**Constitutional Provisions**

42 Pa. Const. Stat. Ann.
  § 8343.............................................................................................................................17
  § 8343(a) .......................................................................................................................18

First Amendment ..................................................................................1, 22, 26, 36

DWT30845529v3

Defendants Simon & Schuster, Inc. ("S&S") and J. Michael Lennon ("Lennon"), by undersigned counsel, respectfully file this Memorandum of Law in Support of their Motion for Summary Judgment with respect to the claims against them in Plaintiff Carole Mallory's ("Mallory's) Fourth-Amended Complaint ("FAC").

## PRELIMINARY STATEMENT

Defendants through this motion seek to resolve the few remaining claims asserted by Mallory against the publisher and author of Norman Mailer's biography entitled *Norman Mailer: A Double Life* (the "Book"). The Court already dismissed Mallory's cause of action for commercial disparagement-injurious falsehood and held five of seven categories of statements Mallory complained of were not capable of defamatory meaning.[1] The Court did not dismiss Mallory's remaining claims, however, in large part because the Court would not consider evidence outside of the pleadings – including Mallory's own statements in her memoir. Now, Mallory, as an acknowledged limited purpose public figure, must not only establish the basic elements of her defamation and false light claims under Pennsylvania law and the First Amendment, which fully protects the Book, but must also establish that Defendants acted with actual malice when publishing the Book. With significant extrinsic evidence – most tellingly Mallory's own words -- the undisputed facts show that Mallory has failed to meet her burden and summary judgment should be granted as to Mallory's remaining claims for the following independent reasons:

*First*, the statement that Mallory "picked up" a list of men is not defamatory because it is an accurate quote from Mallory's own memoir, *Loving Mailer*, about her affair with Mailer and other men. An accurate quote of her own words cannot be defamatory.

---

[1] While Mallory complained of more than seven statements made in the Book, for ease of determination, the Court grouped them together into seven categories.

*Second,* the reference to Mallory as a "star seducer" is "pure opinion" based on the disclosed, true facts that Mallory boasted in her own "2009 memoir" and press interviews that she "picked up" stars "including Clint Eastwood, Robert De Niro, Warren Beatty, Richard Gere, Sean Connery, Anthony Hopkins, Peter Sellers . . . and Dodi Fayed[.]" Such a "pure opinion" based on disclosed facts, is non-actionable.

*Third,* Mallory cannot support a finding that S&S and Lennon published the Book with the requisite degree of fault. Mallory concedes, and the Court has previously found, that she is a limited-purpose public figure (See *Mallory v. S & S Publishers,* 168 F. Supp. 3d 760, 768, n.9 (E.D. Pa. 2016); ECF 75, page 10, n.9), and as such, for both her defamation and false light claims Mallory must provide clear and convincing evidence that S&S and Lennon acted with actual malice – knowledge of falsity or serious doubts as to the truth – which she has not, and cannot, do. In fact, her sole allegation of fault, namely that Lennon acted negligently in relying on her memoir and other writings instead of interviewing her, is insufficient as a matter of law to allege actual malice (and does not even support a finding of negligence). Moreover, the multiple first hand sources (including Mailer) and previously published reports (including Mallory's memoir) relied upon by S&S and Lennon in publishing the Book show that Defendants did not entertain serious doubts as to the truth of the publication because those sources and materials supported each of the statements made in the Book.

*Finally,* in addition to her failure to produce any evidence to support actual malice, Mallory's false light claim fails because she has not shown that the statements at issue are substantially false – instead they are entirely consistent with her own statements – and they therefore could not possibly be "highly offensive" as required for a false light claim.

Because Mallory has failed to provide any evidence to support her claims and the undisputed evidence shows Mallory in fact has no claim, the Court should grant Defendants' motion for summary judgment in its entirety.

## STATEMENT OF FACTS

The facts relevant to this motion are not subject to any genuine dispute and are more fully described in the declarations of J. Michael Lennon, Robert Bender and Sean M. Sullivan, which are submitted with this motion. To briefly summarize:

**A.      The Parties**

Plaintiff Carole Mallory alleges that she "was and is a self-made supermodel, writer, and professional in a then long-time loving relationship with Mail[e]r." (Plaintiff's Fourth-Amended Complaint ("FAC"), ECF No. 61, at 2, ¶ 10.) In the 1970s and 1980s, she graced the covers of *Cosmopolitan* and *New York Magazine* and appeared on television shows and in films such as *Take This Job and Shove It and Stepford Wives*. (Ex. B, Book at 592, Declaration of Sean M. Sullivan ("Sullivan Decl."), ¶ 2.) She was a journalist who conducted interviews with celebrities, including Mailer, Joseph Heller, Kurt Vonnegut, and Gore Vidal. (*Id.* at 593-94.) She authored a 2009 memoir about her relationship with Mailer, *Loving Mailer*, and also authored a 1988 novel entitled *Flash*. (*Id.* at 594, 657.)[2]

Defendants J. Michael Lennon and S&S are the author and publisher, respectively, of *Norman Mailer:  A Double Life*, a biography of the celebrated author. S&S is one of the oldest and best-known book publishers in the United States. (Declaration of Robert Bender ("Bender Decl."), ¶ 2.) Lennon is an emeritus professor of English at Wilkes University and before

---

[2] Complete copies of the Book and Mallory's memoir, *Loving Mailer* (the "Memoir") were previously filed with the Court at ECF Nos. 38-4 to 38-12 and 38-1 to 38-3, respectively. Rather than re-file these documents, Defendants are filing relevant excerpts of the Book and Memoir along with this motion (Sullivan Decl. ¶¶ 2, 3, Exs. B, C) and otherwise refer the Court to the already filed complete versions.

authoring the Book, had edited several other books by and about Mailer.  (Declaration of J.

Michael Lennon ("Lennon Decl."), ¶ 2.)

**B.**     *Norman Mailer:  A Double Life*

A Double Life is a 947 page authorized biography of the literary giant, Norman Mailer.

As described on the jacket of the Book, Mailer was a man of multiple identities:  "He was a

novelist, journalist and filmmaker; a provocateur and passionate observer of his times; and a

husband, father and serial philanderer who invented and reinvented himself throughout his

lifetime." (Ex. B, Book, at back cover.)  Mallory appears on only a handful of pages in the

biography, exclusively in the course of discussing Mailer as a "serial philanderer." (*Id.*)

Mallory is introduced in the twelfth chapter of the Book and is described as Mailer's

"new mistress," a former "cover model for major magazines like *New York* and *Cosmopolitan*

who also had had small roles in a few films. . . . ." (*Id.* at 592.)  The Book recounts that Mailer

asks his agent, Jack Scovil, to transfer money to Mallory and Scovil observes that he was

"surprised that Norman would get involved with someone like that," referring to Mallory's

reputation as a "star seducer." (*Id.* at 592.)  The Book then proceeds to explain this

characterization:  "In several interviews . . . and a 2009 memoir, Mallory lists the men that she

had 'picked up,' including Clint Eastwood, Robert De Niro, Warren Beatty, Richard Gere, Sean

Connery, Anthony Hopkins, Peter Sellers . . . and Dodi Fayed. . . .  She was also engaged to

Picasso's son Claude during the 1970's – he jilted her – and claims to have turned down

propositions from Albert Finney and Jack Nicholson." (*Id.* at 592-93.)

The Book explains that, after an initial introduction, Mallory sought out Mailer to obtain

his opinion of a memoir she was writing of her years with Claude Picasso. (*Id.* at 593.)  They

met, he read some of her memoir, and later that summer an affair began when Mailer was

visiting Los Angeles. (*Id.*)  Soon, the Book describes how Mallory was "in love" with Mailer, in

4

part because of his "detailed writing advice." (*Id.*)  Indeed, as the Book makes clear, while Mailer provided Mallory with a $200-a-week stipend, he also helped her financially by giving her interviews which she published (including her interview with Mailer and Vidal, which was the cover feature in the May 1996 *Esquire*).  (*Id.* at 593-94.)  The Book reports that, "[t]hrough him, she also met other writers and celebrities.  Joseph Heller, Erica Jong, Isabella Rossellini, and Kurt Vonnegut are some of the interviewees she mentions in her memoir."  (*Id.*)

Eventually, Mailer's sixth wife, Norris Church, found out about his affair with Mallory. (*Id.* at 594.)  In this context, the Book seeks to make sense of Mailer's eight year affair with Mallory.  It was hardly the only affair Mailer conducted, but the affair caused "consternation" among Mailer's close friends.  (*Id.*)  It quotes Mailer's lawyer, Ivan Fisher, as believing that the "relationship was based on passion."  (*Id.*)  He opined that "It was a huge part of his being.  And a huge part of his passion was sex.  And his relationship with Mallory was 100 percent sexual. Period."  (*Id.*)

Yet, the Book observes that "Fisher's interpretation notwithstanding, Mailer had more than one reason for continuing his relationship [with Mallory]."  (*Id.* at 595.)  Indeed, "[o]ne way to understand Mailer's relationship with Carole Mallory is to see it as partly his lust for experience . . . .  Experience was holy. . . .  Women were of inexhaustible interest to him – mysterious, dangerous, of infinite variety.  Mallory was unlike anyone he had known before." (*Id.* at 596.)  Thus, Mailer "found some kind of moral balance in regard to Mallory, enough to continue with her for almost eight years.  Like Faust, he was greedy for knowledge and ready to trade punishment to gain it."  (*Id.* at 597.)  But the balance shifted when his wife, Norris Church, threatened to leave if he did not stop his philandering.  (*Id.* at 654-57.)  In the end, the Book reports that Mallory shows up at a book party and Church "quietly" told her "that she may as

well enjoy herself because 'she had gotten the last nickel she was going to get out of Norman.'"
(*Id.* at 657.)  Shortly thereafter, Mailer "called Mallory and told her he was severing relations."
(*Id.*)  With that, except for a brief mention about a Page Six item concerning Mallory's 2009
memoir, Mallory never again appears in the Book.

## C.     Proceedings

This case has had a somewhat tortuous procedural history.  Plaintiff, initially appearing
*pro se* and eventually through counsel, has filed four complaints in this action.  In addition to
naming Lennon and S&S, her prior complaints named additional parties she alleged were
responsible for various defamatory statements made in the Book, including the Estates of Mailer
and Norris Church, Ivan Fisher and Jack Scovil.  After each of the defendants filed motions to
dismiss her third amended complaint, Mallory voluntarily moved to dismiss all defendants
except Lennon and S&S.  (ECF No. 43.)  Before the Court could rule on Defendants' motion to
dismiss her third amended complaint, Mallory requested and the Court granted leave for her to
file a fourth amended complaint.  (ECF No. 58.)

The Fourth Amended Complaint asserted four causes of action against Defendants:
defamation, defamation *per se*, commercial disparagement-injurious falsehood and a largely
duplicative claim for false light.  (FAC, ECF No. 61.)  Defendants again moved to dismiss the
Fourth Amended Complaint.  (ECF No. 64.)  After full briefing on the motion, the Court granted
in part and denied in part Defendants' motion.  *Mallory v. S & S Publishers*, 168 F. Supp. 3d
760, 778 (E.D. Pa. 2016) (ECF No. 75, page 26; ECF No. 76).  The Court granted Defendants'
motion to dismiss as to Mallory's commercial disparagement-injurious falsehood claim.  *Id.* at
774-75 (ECF No. 75, pages 19-20).  The Court granted Defendants' motion to dismiss as to five
of seven categories of statements, ruling that none of the five categories of statements were
capable of defamatory meaning, and thus could not form the basis for Mallory's defamation

claims in this action. *Id.* at 768-74 (ECF No. 75, pages 10-19). The Court ultimately found only two categories of statements in the Book capable of defamatory meaning. *Id.* at 768-70 (ECF No. 75, pages 10-13.).

### 1. Alleged Defamatory Statement Number 1

First, the Court found the reference to Mallory as a "star seducer" and the list of men that Mallory "picked up" in the passage below to be capable of defamatory meaning (collectively "Statement No. 1"):

> "*Sometime in the mid-1980s, Mailer asked [his agent] to send money to a new mistress,* Carole Mallory, a former cover model for major magazines like *New York* and *Cosmopolitan* who also had small roles in a few films in the 1970s including *Take This Job and Shove It*. A large poster (which she gave Mailer) for this film, depicting a curvaceous Mallory in a bikini bottom and torn, scanty T-shirt, *rivaled sales of Farrah Fawcett's famous swimsuit poster.* Jack Scovil, *who handled the transfer of funds*, said that he was 'surprised that Norman would get involved with someone like that,' referring to Mallory's reputation as a star seducer. In several interviews, numerous gossip column snippets, and a 2009 memoir, Mallory lists the men that she had 'picked up,' including Clint Eastwood, Robert De Niro, Warren Beatty, Richard Gere, Sean Connery, Anthony Hopkins, Peter Sellers—she said Brits were 'more fun than Americans' . . ."

*Id.* at 768-69 (ECF No. 75, pages 10-11) (emphasis in original).[3]  In rejecting Defendants' arguments for dismissing Mallory's claims based on these statements, the Court largely relied on the position that it could not look to sources outside the pleadings to determine whether or not the statements were direct quotes of Mallory's own statements, or were statements of opinion based on facts Mallory herself disclosed. *Id.* at 769 (ECF No. 75, page 11).  Accordingly, having

---

[3] Because some of the quotes in the FAC were not always accurate, the Court took the quotations from the Book directly, italicizing portions of the quotations that were omitted in the FAC. *Id.* at 768, n.8 (ECF No. 75, page 10, n.8).  Defendants have kept these italicized portions in this brief for ease of reference.

to rely on the pleadings alone, the Court could not determine that the referenced statements were not defamatory in nature. *Id.*

### 2. Alleged Defamatory Statement Number 2

Second, the Court analyzed a number of passages that Mallory alleges "falsely paint her as venal" (collectively "Statement No. 2"). These statements included the following passages:

> He told Mike Lennon that he learned something about venality
> from Mallory and used it in the creation of Chloe, the sexy
> waitress in the opening chapters of *Harlot's Ghost*.
>
> . . .
>
> Mailer found some kind of moral balance in regard to Mallory,
> enough to continue with her for almost eight years. Like Faust, he
> was greedy for knowledge and ready to trade punishment to gain it.
> *"The more prohibited the act, the greater the lure for Mailer,"*
> *according to Rader. "He wanted to know everything."*

*Id.* at 769 (ECF No. 75, page 11) (emphasis in original). The Court also analyzed Mallory's allegations that Lennon stated "with malicious intent that Plaintiff was a venal harlot" when he wrote that Harlot's Ghost "was not Norris's favorite book, especially after she learned that Mallory was the model for the sluttish Maine waitress, Chloe." *Id.* at 769-70 (ECF No. 75, pages 11-12). While the Court acknowledged that the Book nowhere specifically refers to Mallory as a "venal harlot," the Court noted that statements implying promiscuity may be reasonably susceptible to defamatory meaning. *Id.* at 770 (ECF No. 75, page 12). Accordingly, because the Court found the above statements may be defamatory, the Court denied Defendants' motion to dismiss Mallory's defamation claim as to these statements. *Id.* (ECF No. 75, pages 12-13).

### 3. Other Statements Found Not To Be Capable of Defamatory Meaning

As stated above, the Court found five other categories of statements not capable of defamatory meaning and dismissed Mallory's defamation claim arising out of them. However,

as noted below, the Court did not specify whether these statements remained in the action for

Mallory's false light claim.[4]

### a.    Statement Number 3

The statements the Court analyzed collectively as "Statement Number 3" involved a

portion of the below passage that describes a "great scene" that Mallory made in Jack Scovil's

office:

> "They met, he read some of the manuscript—a chapter describing
> her night with Warren Beatty—and she left some lipstick on his
> face as well as her telephone number in Los Angeles. That
> summer, when he was in Los Angeles doing publicity for Tough
> Guys Don't Dance, they had their first tryst at the Bel Air Hotel.
> *Soon, she was seeing him when he was in L.A. and was in love. She*
> *loved his fame, his wit, his sexual equipment, his detailed writing*
> *advice. "I longed for an affair with a genius," she said. During*
> *their time together, she said, "I noticed that he used words like*
> *oxymoron, swath, and sententious.* Hearing him speak was an
> education." She also loved the money *he gave her. But at one*
> *point, her $200-a-week stipend ceased, as Scovil recalled. "Scott*
> *would never authorize giving Carole money unless Norman had*
> *authorized it.* And there was a point where Norman wanted to cut
> her off and Carole had come up to the office and caused a great
> scene. She was doing all kinds of things, saying all kinds of things,
> and that she deserved the money.["]

*Id.* at 770-71 (ECF No. 75, page 13) (emphasis in original).  The Court found the statement that

Mallory caused a "great scene" not to be capable of defamatory meaning because, based on the

context of the statement and the portrayal of the affair in the Book, "it is clear that there was

more to Mallory's relationship with Mailer than money." *Id.* at 771 (ECF No. 75, page 14).

---

[4] The Court observed that the "torts of defamation and false light invasion of privacy are similar but have key
differences," including that a false light claim "does not require harm to reputation…inherent in a defamation
claim." *Id.* at 776-77 (ECF No. 75, page 23), quoting *Fanelle v Lojack Corp.,* No CIV. A. 99-4292, 2000 WL
1801270, at *9 (E.D. Pa. Dec. 7, 2000).  While the Court did not specifically address these statements in its false
light discussion, since they were dismissed for lack of defamatory meaning, they possibly could remain for the false
light claim.

### b.      Statement Number 4

Statement Number 4 was one attributed to Ivan Fisher that the relationship between Mailer and Mallory was "100 percent sexual." *Id.* at 771-72 (ECF No. 75, pages 14-15).  The Court, looking at the context surrounding the statement, found that portion of the Book could not be said to have "grievously fractured" Mallory's standing in the community, and thus not defamatory. *Id.* at 772 (ECF No. 75, page 15).  Further, the Court found the statement to be a non-actionable "opinion based on passion and sex being 'a huge part of [Mailer's] being' and based on Flash, Mallory's novel about a female flasher." *Id.*

### c.      Statement Number 5

The statements the Court analyzed collectively as "Statement Number 5" involved a passage where it is reported that S&S did not publish a couple of her manuscripts to argue that the Book did not mention that "her work was and still is sold and published." *Id.* at 772 (ECF No. 75, page 16).  The Court found that given the context of the quoted material, "including the fact that the [Book] references her as the author of Loving Mailer, Flash, and numerous published interviews—it cannot reasonably be considered defamatory." *Id.*  The Court also analyzed another passage in which Mallory alleges that she was turned down for a small role in *Tough Guys Don't Dance*. *Id.* at 772-73 (ECF No. 75, pages 16-17).  The Court held with respect to this statement that while the statement may cause embarrassment, it has not caused Mallory to suffer "the kind of harm which has grievously fractured [her] standing in the community of respectable society." *Id.* at 773 (ECF No. 75, page 17) (internal citations omitted).

### d.      Statement Number 6

The statements the Court analyzed collectively as "Statement Number 6" involved a number of quotes that Mallory contends present her relationship with Mailer "not as a talented professional but rather a ruse based on sex to advance her career."

10

> When asked about her motives in 2006, Mailer said, "She was totally on the make." *Fisher's interpretation notwithstanding, Mailer had more than one reason for continuing his relationship.*
>
> Mallory was unlike anyone he had known before. He was fascinated by her crassness and amazed by her promiscuity, *which seemed to match his own. There was so much to learn.*
>
> *Mallory says that she was in love with him and not merely interested in what he could do for her. Perhaps she was.* She knew him but superficially, however.  Convinced that he was an alcoholic, she took him to one of her AA meetings.

*Id.* at 773 (ECF No. 75, page 17).  Again, the Court found that the statements, when read in context, were not capable of defamatory meaning because they would not grievously fracture Mallory's standing in the community.  *Id.* (ECF No. 75, pages 17-18).  Interestingly, the Court correctly noted that Mallory did not object to the part of the quoted language that states that her promiscuity "seemed to match" that of Mailer, and that Mailer had "so much to learn."  *Id.*

### e.    Statement Number 7

Finally, the Court analyzed as Statement Number 7 certain statements that Mallory alleged "maliciously fabricate [d] a conversation between Plaintiff and Norris incorrectly portraying Plaintiff as merely using Mailor [sic] for money."  *Id.* (ECF No. 75, page 18).  The specific passage at issue was:

> *When* Harlot's Ghost *was published, there were several book events in New York.* At the Random House party at the "21" Club (*scene of Cal and Harry Hubbard's memorable lunch in the novel), hosted by publisher Harry Evans on October 31,* Carole Mallory showed up. She was "shockingly brazen," Norris said, and kept bringing photographers over to take her picture with Mailer. She seemed to be taunting Norris, or seeking to create a scene or a physical altercation. Norris ignored her, and then told her quietly that she might as well enjoy herself because "she had gotten the last nickel she was going to get out of Norman." Norris was correct: Mallory had lost her sugar daddy. Once again, looking to context of the statement.

11

*Id.* at 773-74 (ECF No. 75, page 18).  Once again, the Court held that the statement was not capable of defamatory meaning because, given the context, it cannot reasonably be said to cause harm that "grievously fractured [her] standing in the community of respectable society." *Id.* at 774 (ECF No. 75, pages 18-19).  In reaching this conclusion, the Court noted that Mallory did not dispute that Mailer paid her a regular stipend and eventually stopped paying her. *Id.* (ECF No. 75, page 18).

### 4.  Plaintiff's Defamation *Per Se* and False Light Claims

The Court denied Defendants' motion to dismiss Mallory's defamation *per se* and false light claims although, as noted above, the Court did not specify which statements remain in the case with respect to these claims.  First, regarding the defamation *per se* claim, the Court cited Mallory's allegations that "certain statements in the Biography portray her as a woman who exchanged sex for money and opportunity." *Id.* at 775 (ECF No. 75, page 21).  Accordingly, the Court held it could not dismiss Mallory's defamation *per se* claim at the pleading stage because "certain statements in this case may rise to the level of 'serious sexual misconduct' under Pennsylvania law." *Id.* at 775 (ECF No. 75, pages 21-22).

Regarding Mallory's false light claim, Mallory contended that: "stating that Plaintiff was essentially a venal whore whose relationship with Mailor [sic] was solely for money and professional advancement is not only untrue but additionally places Plaintiff in a false light when her own achievements as well as loving relationship with Maior [sic] have been pleaded." *Id.* at 777 (ECF No. 75, page 24).  The Court, accepting at the pleading stage Mallory's allegations as true, found Mallory had sufficiently pled a claim of false light. *Id.*  In addition, the Court noted that analyzing whether Defendants "[knew] that the plaintiff, as a reasonable [woman], would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity," as well as whether Defendants "had knowledge of or acted in reckless disregard as to

the falsity of the publicized matter" would "at a minimum, require consideration of Mallory's

memoir." Because the Court found it could not consider the content of *Loving Mailer* at the

pleading stage, it denied Defendants' motion to dismiss Mallory's false light claim. *Id.* (ECF

No. 75, pages 24-25)

**D.      Sourcing, Writing and Publication of the Book**

Lennon spent years researching and sourcing the material that was ultimately used in the

Book. In late 2006, Mailer asked Lennon to take over the writing of his biography after the

death of his prior biographer. (Lennon Decl., ¶ 6.) Lennon was and is the country's foremost

Mailer scholar, having at the time edited, authored or co-authored a number of books by and

about Mailer and his writings, including *Pieces and Pontifications* (1982), *Critical Essays on*

*Norman Mailer* (1986), *Conversations with Norman Mailer* (1988), *Norman Mailer: Works and*

*Days* (2000), *The Spooky Art: Some Thoughts on Writing* (2003), and *Norman Mailer's Letters*

*on An American Dream*, *1963-69* (2004). (Lennon Decl., ¶¶ 3-5; Bender Decl., ¶ 10.) Having

known Mailer since 1972, Lennon had unrivaled access to all the key individuals in Mailer's life

(not the least of which was Mailer himself). (Lennon Decl., ¶ 7; Bender Decl., ¶ 10.)

Rather than just picking up from where the prior biographer had left off, Lennon started

an entirely new biography. (Lennon Decl., ¶ 6.) When preparing for and writing the new

biography, Lennon conducted approximately one-hundred fifty (150) interviews of eighty-five

(85) people, conducting the majority in person. (*Id.* at ¶ 7.) He also read approximately 50,000

letters that Mailer wrote, numerous articles and published interviews, and a number of books and

autobiographies. (*Id.* at ¶ 8.) In all, Lennon relied upon over a thousand different sources. (*Id.*)

Lennon of course did not interview everyone that was mentioned in the Book, including

Mallory. Lennon, like all good biographers, prioritized his interviews, focusing on those sources

for whom he did not have much information, or that were older and might not live much longer.

(*Id.* at ¶ 9.)  Sources that had published memoirs, given interviews, or about whom there was a plethora of published material about their relationship with Mailer were not prioritized, or interviewed at all.  (*Id.*)  In fact, Lennon did not interview a number of individuals that had written memoirs in which Mailer was a figure, including: Dwayne Raymond, Mailer's assistant from 2003-08; Phyllis Ott-Toltz, the sister of Mailer's first wife, who had an affair with Mailer in the 1950s; Dan Wakefield, who wrote a memoir of Greenwich Village, and interviewed Mailer for it; Pete Hamill, who wrote about Mailer in his memoir, *A Drinking Life*, and other places; Paul Krassner, who wrote a memoir about his life as one of the founders of the underground press, and knew Mailer well; Alice Denham, who knew Mailer, had a one-night stand with him, and wrote about him in a memoir entitled, *Sleeping with Bad Boys*.  (*Id.* at ¶ 10.)

Regarding Mallory, Lennon had a wealth of published materials about her relationship with Mailer, including: Mallory's memoir, *Loving Mailer;* her novel, *Flash*; a half-dozen of Mallory's interviews with Mailer; and a clip file of her public statements to the press, many of which were given to him by Mailer.  (*Id.* at ¶ 11.)  Notably, many of these articles and public press statements characterize Mallory as a "sexpot," with Mallory herself stating that she had an "addiction to sex" and the prior reports detail her relations with Hollywood celebrities, yet in no instance did Mallory seek a correction or retraction from any of the authors of those articles.  (*Id.* at ¶¶ 11, 15, Ex. A at LENNON 000025-000026, 000032, 000037, 000040-000042, 000046-000047, 000050, 000053, 000055-000059, 000061-000070, 000072-000073, 000080, 000082-000083; Sullivan Decl., ¶ 6, Ex. D [Mallory Dep. Tr. at 170-220].)  Lennon also had his own interactions with Mallory, most by email, to draw on, although he had met her a couple of times, most memorably at the 1986 PEN international conference in New York, which Mailer chaired as PEN president.  (Lennon Decl., ¶ 12.)

As the Book makes clear, Lennon relied on "several interviews, numerous gossip column snippets, and a 2009 memoir" for the fact that Mallory "picked up" numerous famous men. (Book at 592-93.)  Indeed, Mallory's 2009 memoir unequivocally states:

> "My looks had gotten attention. Corporations paid to have America look at me. That's what modeling was. Because of my looks I'd ***picked up*** Bobby De Niro, Sean Connery, Richard Gere, Peter Sellers, Matt Dillon, Marcello Mastroianni, Warren Beatty, Rod Stewart, Clint Eastwood, and Rip Torn."

(Sullivan Decl., ¶ 4; Ex. C, at 24, emphasis added.)  As already discussed above, the reference to a "star seducer" comes from an interview with Scovil, who observed that he was "surprised that Norman would get involved with someone like that," referring to Mallory's reputation as a "star seducer."  (Book at 592.)  Further, in various interviews (relied on by Lennon) Mallory boasted that she "picked up" or "seduced" a number of stars.  (Lennon Decl., ¶ 15; Ex. A at LENNON 000064-000065, 000067-000069, 000072, 000080, 000082-000083.)  In the *Parade* magazine article, Mallory discusses her "addiction to sex." (*Id.* at LENNON 000025-000026.)  And a *Mail Online* article included an extensive interview with Mallory.  (*Id.* at LENNON 000061-000070.)  The article reports that Mallory "doesn't flinch as she reels off the names of the one-night stands and adulterous flings she had with some of the top film stars of her generation." (*Id.* at LENNON 000064.)  Mallory even freely talked of seducing a number of them:  "Robert DeNiro, Richard Gere, Warren Beatty, Robin Williams and Matt Dillon are among the American contingent she claims to have seduced" and describes Warren Beatty as a "terrific one-night stand." (*Id.* at LENNON 000064, and 000067.)  The article also refers to Mallory's "promiscuous lifestyle" and references that Mallory "admits she has always had a penchant for boy-toys." (*Id.* at LENNON 000067.)

The other statements in the Book were equally well sourced.  First, as already highlighted above, Mallory candidly detailed multiple times, in her own memoir and in numerous articles,

the various men she slept with and her sexual exploits.  Lennon also had notes from interviews

with Mailer during which he revealed that Mallory was the "chief model for the lubricious

waitress in the opening chapters of *Harlot's Ghost*."  (Lennon Decl., ¶¶ 14, 15, Ex. A at

LENNON 000016.)  In that same interview, Mailer also said that while he was sorry about the

damage his affair with Mallory had caused, he nevertheless didn't regret it entirely because he

had learned so much from her.  When Lennon asked what he had learned about, he said,

"venality."  (*Id.*)  Lennon also reviewed and relied on a memo from a reporter for the *New York*

*Post*, which was sent to Mailer's assistant about a story he was doing on Mallory and Mailer, in

which the reporter stated that Mallory "alleges that the character of Chloe in HG is based on her,

which NM told her."  (*Id.* at LENNON 000017-000019.)

     Further supporting Mailer's own statement about learning "venality" from Mallory, there

were multiple sources Lennon reviewed that discussed Mallory's interest in money.  (*See* Lennon

Decl., ¶ 13.)  These sources included Norris Mailer's memoir, *A Ticket to the Circus*, in which

Norris describes Mallory as the "author of the note asking for a thousand dollars," and "a woman

[Mailer] had been giving money to for nine years…."  (Lennon Decl., ¶ 15, Ex. A at LENNON

000095-000099.)  Lennon also had a copy of the note from Mallory referenced by Norris Mailer

promising not to ask for any more money from Mailer.  (*Id.* at LENNON 000015.)  In short, the

depiction of Mallory was amply documented from multiple sources and was entirely consistent

with the image Mallory presented to the world.

## ARGUMENT

### I.

### SUMMARY JUDGMENT IS APPROPRIATE HERE

     On summary judgment, when the moving party, as here, demonstrates the absence of a

disputed issue of material fact, *Celotex v. Catrett*, 477 U.S. 317, 322 (1986), the non-moving

party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Mendoza v. Gribetz Intern., Inc.*, No. 10–1904, 2011 WL 2117610, at *2 (E.D. Pa. May 27, 2011). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).

To state a claim for defamation under Pennsylvania law, Mallory has the burden of proving: "(1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to plaintiff; (6) special harm to the plaintiff; (7) abuse of a conditionally privileged occasion." *Krajewski v. Gusoff*, 53 A.3d 793, 802 (Pa. Super. Ct. 2012) (affirming dismissal of libel claims on opinion grounds), *appeal dismissed as moot*, 84 A.3d 1057 (Pa. 2014) (internal quotation marks omitted); 42 Pa. Cons. Stat. Ann. § 8343. Because this is an action against media defendants involving the very public affairs of a celebrated author that is unquestionably a matter of public concern, Mallory must also prove falsity. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19-20 (1990) ("[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved[.]") (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776-77 (1986)).

Here, Mallory has failed to present evidence to support two significant elements of a defamation claim: (1) that the statements are capable of defamatory meaning; and (2) that S&S

and Lennon acted with knowledge of falsity or with serious doubts as to the truth of the statements, as required in light of Mallory's status as a public figure.  After full discovery – including depositions and a full exchange of documents – the undisputed facts establish that plaintiff's claims fail as a matter of law.  Accordingly, her action should be summarily dismissed.

## II.

### ACCURATELY QUOTING MALLORY'S OWN STATEMENTS CAN NOT DEFAME HER

**A.**   **In Context, The Statement That Plaintiff "Picked Up" Certain Stars Is Not Capable of Defamatory Meaning Because It Is an Accurate Quote of Mallory**

Mallory has not established that the statement that she was "picked up" by a list of men is defamatory of her.  *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 123 (Pa. 2004) ("'In an action for defamation, the plaintiff has the burden of proving . . . [t]he defamatory character of the communication.'") (quoting 42 Pa. Cons. Stat. Ann. § 8343(a)).  A communication is defamatory if it tends to so harm the reputation of another as to lower her in the estimation of the community or to deter third persons from associating or dealing with her.  *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 215 (Pa. 1981); Restatement (Second) of Torts § 559.  Although Mallory may not like how the Book portrays her, "[i]t is not enough that the victim of 'the slings and arrows of outrageous fortune' be embarrassed or annoyed, [she] must have suffered that kind of harm which has grievously fractured [her] standing in the community of respectable society."  *Scott-Taylor, Inc. v. Stokes*, 229 A.2d 733, 734 (Pa. 1967); *Tucker*, 848 A.2d at 124 (same); *Kryeski v. Schott Glass Techs., Inc.*, 626 A.2d 595, 601 (Pa. Super. Ct. 1993) ("merely annoying or embarrassing" statements are not actionable).

It is a question of law for the Court to decide, in the first instance, whether the statements at issue are capable of defamatory meaning.  *See, e.g.*, *Remick v. Manfredy*, 238 F.3d 248, 261

(3rd Cir. 2001) ("The trial court must determine as a matter of law whether the communication is capable of having defamatory meaning; if not, the claim should be dismissed."); *Tucker*, 848 A.2d at 123-24. Moreover, it is error to view a statement in isolation. "In determining whether a communication is defamatory, the court must view the statement 'in context' with an eye toward 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Remick*, 238 F.3d at 261 (quoting *Baker v. Lafayette Coll.,* 532 A.2d 399, 402 (Pa. 1987)). Nor may the Court place a strained or unreasonable construction upon the language of the publication to find defamatory meaning. *Thomas Merton Ctr.*, 442 A.2d at 216-17.

In context, the statement that Mallory "picked up" certain stars is not defamatory as a matter of law. Mallory alleges that the Book defamed her by stating that she "picked up" stars, including Robert De Niro, Warren Beatty, Richard Gere, Sean Connery, Anthony Hopkins, Peter Sellers, and Clint Eastwood. (FAC, ECF No. 61, at 2-3, ¶ 13(a).) Mallory alleges in the FAC that "I did not pick up these men"; rather "they were introduced to me or came to me." (*Id.*) In her deposition, Mallory went further, claiming that to the extent she used the term "picked up," it was meant to be satire. (Sullivan Decl. ¶ 6, Ex. D [Mallory Dep. Tr. 61:21-62:6].) She then claimed that a number of the men she listed actually picked her up. (*Id.*)

But the Book quotes directly from Mallory's own "2009 memoir" for the statement that she "picked up" these men. (Ex. B, Book, at 592-93, and Notes at 878-79.) Indeed, Mallory's memoir, *Loving Mailer*, expressly states: "Because of my looks I'd *picked up* Bobby De Niro, Sean Connery, Richard Gere, Peter Sellers, Matt Dillon, Marcello Mastroianni, Warren Beatty, Rod Stewart, Clint Eastwood, and Rip Torn." (Ex. C, Memoir, at 24, emphasis added.) Mallory repeated this same statement that she "picked up" or "seduced" a number of famous men in

19

numerous articles she was interviewed for.  (Lennon Decl., ¶ 15, Ex. A at LENNON 000064-000065, 000067-000069, 000072, 000080, 000082-000083.)  Indeed, as detailed in Section D of the Statement of Facts, *supra*, in the *Parade* piece, Mallory discusses her "addiction to sex." (*Id.* at LENNON 000025-000026.)[5]

Accurately quoting Mallory's own words does not defame her.  *See, e.g.*, *Damon v. Moore*, 520 F.3d 98, 107-08 (1st Cir. 2008) (holding that accurately quoting a person to make an argument with which the person disagrees, may not, without more, defame a person).  Indeed, courts across the country have extended the "truth defense" to include an "own words" defense. *See e.g.*, *Thomas v Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) (holding that "(a) party's accurate quoting of another's statement cannot defame the speaker's reputation since the speaker is himself responsible for whatever harm the words might cause. . . . The fact that a statement is true, or in this case accurately quoted, is an absolute defense to a defamation action.")

In her deposition, Mallory asserted that by omitting the reference to the line from her memoir that she picked up these men "because of her beauty" the Book created a different, negative implication that she was an "untalented, angry, venal slut."  (Sullivan Decl., ¶ 6, Ex. D [Mallory Dep. Tr. at 60:13-62:6].)  But this newly created theory fails as well because courts will not allow contextual discrepancies to overcome own words defenses.  *Van Buskirk v Cable News Network, Inc.*, 284 F.3d 977, 981-982 (9th Cir. 2002) (applying the "own words" defense despite "contextual discrepancies" between the plaintiff's own words and the defendants' quotation of those words); *Johnson v Overnite Transp. Co.*, 19 F.3d 392, 392 n1 (8th Cir. 1994) (recognizing

---

[5] As noted above, in the *Mail Online* piece, the author writes that Mallory "doesn't flinch as she reels off the names of the one-night stands and adulterous flings she had with some of the top film stars of her generation." (*Id.* at LENNON 000064.)  Mallory even freely talked of seducing a number of them:  "Robert DeNiro, Richard Gere, Warren Beatty, Robin Williams and Matt Dillon are among the American contingent she claims to have seduced" and describes Warren Beatty as a "terrific one-night stand." (*Id.* at LENNON 000064, and 000067.)

the "general rule that a defamation claim arises only from a communication by someone other than the person defamed"); *Smith v School Dist.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (noting that "(g)enerally, a plaintiff can not (sic) be defamed by the use of his own words").

Further, even accepting Mallory's libel-by-implication claim, the test is not whether the Book implies something negative about Mallory. *See The Knit With v. Knitting Fever, Inc.*, No. Civ.A. 08-4221, 2010 WL 3792200, at *8 (E.D. Pa. Sept. 28, 2010) ("negative statements" are not actionable unless the "statements are false"); *Synthes, Inc. v. Emerge Med., Inc.*, No. CIV.A. 11-1566, 2014 WL 2616824, at *7 (E.D. Pa. June 11, 2014) ("A publication that contains negative statements, but is not otherwise false does not give rise to a claim of trade libel . . . ."). None of the implications Mallory strains to identify could plausibly imply a false and defamatory fact. *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) ("[D]efamation may be established where a statement, viewed in context, creates a false implication."). Courts must be especially vigilant where, as here, false implications are alleged to arise from literally true statements. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993) ("[B]ecause the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true."); *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) ("[I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established."). This is because courts should not act as editors that second-guess a publisher's exercise of editorial control and judgment over what to print or omit. *See Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986) ("The implication . . . comes from semantic ambiguity, not from false statements made by *Newsweek*. . . . [T]his Court will not make editorial judgments about specific word choice in

21

order to portray a plaintiff in the best possible light . . . ."). *Cf. Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("It has yet to be demonstrated how governmental regulation of [the exercise of editorial control and judgment by a publisher] can be exercised consistent with First Amendment guarantees of a free press . . . ."). Whether she picked up these men because of her beauty or for some other reason does not change the indisputable fact that Mallory "picked up" a long list of famous men. Mallory is the key source of this information, as is documented by her memoir and numerous interviews she gave to the media. Such undisputed evidence defeats Mallory's defamation claim.

**B.  The Statement That Plaintiff Is a "Star Seducer" Is Non-Actionable Opinion Based On Mallory's Own Statements**

As a matter of bedrock principle under both Pennsylvania and federal law, a defamation action can only be based on statements of objective fact, and cannot be based on an expression of opinion. *Milkovich*, 497 U.S. at 20 ("[S]tatement[s] of opinion relating to matters of public concern which do[] not contain a provably false factual connotation will receive full constitutional protection."); *Krajewski*, 53 A.3d at 803 (same); *Brophy v. Philadelphia Newspapers, Inc.*, 422 A.2d 625, 632-34 (Pa. Super Ct. 1980) (expressions of opinion, including publication of accurate reports of the opinions of others, are constitutionally protected).

Statements lacking a provably false factual connotation, no matter how vituperative, are afforded full constitutional protection. *See, e.g.*, *Krajewski*, 53 A.3d at 803 (dismissing libel claims as to publications that were "matters of opinion" that "neither reported nor implied facts that were 'provably false'"); *Remick*, 238 F.3d at 261 ("In Pennsylvania, an opinion cannot be defamatory unless it 'may reasonably be understood to imply the existence of *undisclosed defamatory facts* justifying the opinion.'") (quoting *Baker,* 532 A.2d at 402) (internal quotation marks omitted). Statements of opinion include hyperbole and epithets, which are likewise not

22

actionable. *E.g.*, *Remick*, 238 F.3d at 262; *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 187 (3d

Cir. 1999) ("[S]tatements which are . . . no more than rhetorical hyperbole or a vigorous epithet

are not defamatory.") (quoting *Schott Glass Techs.*, 626 A.2d at 601).

     An allegation of motivation is quintessentially subjective, so statements ascribing a

particular motivation to another – that Mallory is a "star seducer" – are non-actionable opinion

*See Vurimindi v. Fuqua School of Business*, No. 10-234, 2010 WL 3419568, at *12 (E.D. Pa.

Aug. 25, 2010) (alleged statements that plaintiff needed to have sex was opinion as a matter of

law); *Purcell v. Ewing*, 560 F. Supp. 2d 337,  342 (M.D. Pa. 2008) (finding statements that

plaintiff's photograph "looks to me like that" of "someone accused of child molestation" and that

plaintiff is a "pervert[] to look out for" were opinion as a matter of law, reasoning that "[n]o

reader could reasonably believe that the posting derives from any implied defamatory facts

because–by its very terms–it originates exclusively in the mind of [the defendant]"). *See also*

*Immuno AG. v. Moor-Jankowski*, 145 A.D.2d 114, 134, 537 N.Y.S.2d 129, 141 (N.Y. App. Div.

1989) ("Inquiry as to motivation is generally absolutely privileged, for motivation is ordinarily

hidden from view and it is, therefore, understood that most statements concerning motivation do

not proceed from certain knowledge but from the observation and interpretation of conduct."),

*aff'd*, 549 N.E.2d 129, 134 (N.Y. 1989) ("Speculations as to the motivations . . . generally are not

readily verifiable, and are therefore intrinsically unsuited as a foundation for libel."), *vacated*,

497 U.S. 1021 (1990), *adhered to on remand*, 567 N.E.2d 1270 (N.Y. 1991), *cert. denied*, 500

U.S. 954 (1991).

     Scovil's conclusion that Mallory was a "star seducer" is his opinion based on the

disclosed, true facts that Mallory stated in her own "2009 memoir" and in numerous published

articles that she "picked up" stars "including Clint Eastwood, Robert De Niro, Warren Beatty,

Richard Gere, Sean Connery, Anthony Hopkins, Peter Sellers . . . and Dodi Fayed[.]" (Ex. B, Book at 592-93.)  Such a "pure opinion" based on disclosed facts, is non-actionable.  *Rockwell v. Allegheny Health, Educ. & Research Found.*, 19 F. Supp. 2d 401 (E.D. Pa. 1998); *Green v. Mizner*, 692 A.2d 169 (Pa. Super. Ct. 1997).  Accordingly, Mallory's defamation claim related to the statement that she was a "star seducer" must fail.

**III.**

**THERE IS NO TRIABLE ISSUE OF ACTUAL MALICE FOR BOTH THE DEFAMATION AND FALSE LIGHT CLAIMS**

**A.     Mallory Is A Limited Purpose Public Figure Who Must Prove Actual Malice**

Mallory has utterly failed to provide facts that suggest S&S and Lennon acted with actual malice, as required for a public figure to plead a defamation claim.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335-37 (1974).  Mallory has admitted, and the Court has found, that she is a limited-purpose public figure.  *See Mallory*, 168 F. Supp. 3d at 768, n.9 (ECF 75, page 10, n.9).  The FAC, the Book and Mallory's own deposition testimony also show that she is a public figure with access to the media.  (FAC, ECF No. 61, at 2, ¶ 10, 4, ¶ 13(d); Ex. B, Book at 592-94, 657; *see also* Sullivan Decl. ¶ 6, Ex. D [Mallory Dep. Tr. at 180:4-6].)  Evidence of this includes her memoir about her relationship with Mailer; her novel entitled *Flash*; her numerous interviews with Mailer and other celebrities; her modeling career in which she appeared, for example, on the cover of *Cosmopolitan* and *New York Magazine*; and her acting career in which she was in television shows and films such as *Take This Job and Shove It* and the *Stepford Wives*.  (Ex. B, Book at 592-94, 657.)  Mallory is unquestionably a limited-purpose figure regarding her relationship with Mailer.  *See Corabi v. Curtis Publ. Co.*, 273 A.2d 899, 903, 906, 912-13 & n.15 (Pa. 1971) (holding that a well-known entertainer with access to the media was a public figure); *Vitale v. National Lampoon, Inc.*, 449 F. Supp. 442, 445 (E.D. Pa. 1978) (finding that well-

24

known local singer who voluntarily posed as a Playboy model was a limited-purpose public figure for the purpose of her role in posing in *Playboy* magazine).

## B.     Actual Malice Is An Exacting Standard

Actual malice is "a term of art denoting deliberate or reckless falsification." *Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 499 (1991).* Actual malice is an exacting standard that requires a plaintiff to plead that the speaker made each defamatory statement with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see also Gertz*, 418 U.S. at 334 n.6. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson, 390 U.S. 727, 731 (1968).* This standard of proof imposes a "heavy burden [on plaintiffs], far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997). Plaintiffs' evidence of actual malice "must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." *Copp v. Paxton,* 45 Cal. App. 4th 829, 846 (Ct. App. 1996).[6]

## C.     Actual Malice Governs Both Mallory's Defamation and False Light Claims

As a limited purpose public figure, Mallory must allege and prove by clear and convincing evidence that each allegedly defamatory statement was made with "'actual malice' –

---

[6] To the extent Mallory maintains a libel-by-implication claim, she must clear an even higher hurdle to show actual malice. The Third Circuit recently held that "plaintiffs in defamation-by-implication cases must show something beyond knowledge of, or recklessness in regard to, the *falsity* of the statement's defamatory meaning." *Kendall v. Daily News Pub. Co.,* 716 F.3d 82, 90 (3rd Cir. 2013). Because in libel-by-implication claims "the statement has defamatory and non-defamatory meanings," to plead actual malice, "plaintiffs must show something that establishes defendants' intent to communicate the defamatory meaning." *Id.* Thus, "to show actual malice for defamation by implication," Mallory must allege facts that plausibly "show by clear-and-convincing evidence both (1) that the defendants either intended the defamatory meaning or knew of the defamatory meaning and were reckless in regard to it, and (2) that the defendants made the statement with knowledge that [the] statement was false or [with] reckless disregard of whether it was false or not." *Id.* at 92-93 (quotation omitted).

that is, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964). This same standard applies to both her defamation claims and her false light claims. *See Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*, No. CIV.A. 3:12-1886, 2013 WL 5466149, at *6 (M.D. Pa. Sept. 30, 2013) ("As with claims of defamation, in actions alleging false light involving a public official, the plaintiff must properly plead and prove actual malice.") (citing *Park v. Veasie*, 2012 WL 1382222 (M.D. Pa. Apr.20, 2012); *Coughlin v. Westinghouse Broad. & Cable, Inc.*, 603 F. Supp. 377, 389 (E.D. Pa. 1985)). *See also Rush v. Philadelphia Newspapers, Inc.*, 732 A.2d 648, 654 (Pa. Super. Ct. 1999) (liability for false light cannot arise from mere negligence); *Seale v. Grammercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998) (public figure, former Black Panther Party Chairman Bobby Seale, could only recover for false light if he pleaded and proved actual malice).

Given the high standard of proof required to show actual malice, courts routinely grant summary judgment dismissing the libel and false light claims of public figures for failure to show actual malice by clear and convincing evidence. The question of whether a plaintiff has produced clear and convincing evidence of actual malice is initially a question of law for the court:

> "The question whether the evidence in the record in a defamation case is of convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'"

*Sprague v. Porter*, No. 1649 EDA 2013, 2014 WL 10803063, at *21 (Pa. Super. Ct. Aug. 26, 2014) (quoting *Curran v. Phila. Newspapers. Inc.*, 546 A.2d 639. 644 (Pa. Super. Ct. 1988) and *Bose Corp. v. Consumers Union*, 466 U.S. 485, 510–11 (1984)). Importantly, while allegations

of actual malice may be sufficient to support libel and false light claims at the pleading stages, more is required at the summary judgment stage. *Taha v. Bucks Cty.*, No. CV 12-6867, 2015 WL 9489586, at *5 (E.D. Pa. Dec. 30, 2015) ("Although Taha's allegations of actual malice were sufficient to support his claim for false light at the early stages of litigation and overcome CIA's motion to dismiss...Taha must point to evidence in the record of actual malice in order to survive CIA's motion for summary judgment now.") (internal citations omitted). *See also Seidman v. Minn. Mut. Life. Ins. Co.*, 40 F. Supp. 2d 590, 595-96 (E.D. Pa. 1997).

**D.     The Undisputed Evidence Precludes a Finding of Actual Malice**

**1.     Lennon's Failure to Interview Mallory Is Insufficient to Show Actual Malice**

Mallory's only direct allegations as to fault are that S&S and Lennon did not afford her "an opportunity to review or comment on the book before publication" (FAC, ECF No. 61, at 2, ¶ 9) and that Lennon "made no efforts to confirm any fact relating to the relationship between" Mallory and Mailer. (*Id.* ¶ 12.) But an allegation of failure to investigate is insufficient, as a matter of law, to show actual malice. *See Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 56 (1st Cir. 2012) (allegations that defendant did not launch "any additional investigation" or were careless did not allege actual malice); *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y. 2013) (finding that failure to investigate is insufficient to allege actual malice); *Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*, 2013 WL 5466149, at *5. Indeed, in *St. Amant v. Thompson*, the Supreme Court rejected this very theory, concluding that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." 390 U.S. at 731. The Pennsylvania Supreme Court also rejected this theory in *Tucker v. Philadelphia Daily News*, where it applied a strict standard of actual malice at the pleading stage. The court held that because the "requirement that

27

the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law," in deciding preliminary objections akin to a motion to dismiss for failure to state a claim, the court must consider, based on the pleading, whether a jury could conclude by "clear and convincing evidence that [ ] newspapers printed statements they knew were false or printed them with reckless disregard of their falsity." 848 A.2d at 130-31. The court then expressly found that "[f]ailure to check sources, or negligence alone, is simply insufficient to maintain a cause of action for defamation" of a public figure. *Id.* at 135; *see also Blackwell v. Eskin*, 916 A.2d 1123, 1126 (Pa. Super. Ct. 2007) (negligent failure to investigate is not sufficient to demonstrate actual malice).

The law could not be more clear that even a total failure to investigate does not establish actual malice. *St. Amant*, 390 U.S. at 730 (no actual malice where defendant lacked personal knowledge of plaintiff's activities, relied solely on a witness' affidavit though the record was silent on the witness' reputation for veracity, and defendant failed to verify the information with those who might have known the facts); *Hardin v. Santa Fe Reporter, Inc.*, 745 F.2d 1323, 1323-24 (10th Cir. 1984) (finding no actual malice where source's statements clearly were not based on fact and the reporter was negligent in failing to investigate the source's background.)

Instead, "[a] failure to investigate may support an inference of actual malice *only* if that failure constituted a 'purposeful avoidance of the truth.'" *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd* 350 F.3d 1272 (D.C. Cir. 2003) (citation omitted). Thus, there must be clear and convincing evidence that the defendant was aware of evidence that would likely contradict her information, but nonetheless did not investigate that evidence. The leading case for the proposition is *Harte-Hankes Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989). There, the defendant's sole source for an allegation that plaintiff had attempted to bribe grand

jury witnesses was a witness who made certain incredible claims.  The witness asserted that her claims could be proven by a tape recorded session with plaintiff and seven individuals.  The reporter interviewed six of the witnesses (and quickly discredited their denials), but refused to review the available tape recording or interview the seventh available witness because it was believed that witness could not be discredited.  *Id.* at 658.  On these extraordinary facts – a far cry from anything plaintiff could argue here – the Supreme Court concluded that the evidence of a clear intent to avoid the truth was sufficient to support a finding of actual malice.  *Id.* at 693. *See also Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 193 (Pa. Super. Ct. 2003) (affirming order granting summary judgment in favor of defendants, rejecting claim that failure to investigate indicated actual malice, stating "[o]ur courts have held…that a failure to investigate 'will not alone support a finding of actual malice.'") (citing *Harte-Hankes Communications, Inc.*, 491 U.S. at 692); *Medure v. New York Times Co.*, 60 F. Supp. 2d 477, 487 (W.D. Pa. 1999) (granting summary judgment for defendants, finding plaintiff failed to show actual malice, stating "in determining whether there is sufficient evidence that a media defendant acted with actual malice, 'we focus upon the investigatory efforts actually undertaken…[and] not upon any additional efforts that might hypothetically have been undertaken.'") (quoting *Fitzpatrick v. Philadelphia Newspapers, Inc.*, 567 A.2d 684, 689 (Pa. Super. Ct. 1989)).

As the Third Circuit's decision in *Crescenz v. Penguin Grp. (USA), Inc.*, 561 F. App'x 173 (3d Cir. 2014), makes clear, even applying the less rigorous negligence standard that applies to non-public figures, the facts here would support summary judgment.  In *Crescenz*, the Third Circuit affirmed the district court's grant of summary judgment in favor of the author and publisher of a non-fiction book as to the plaintiff's claims for defamation and false light with

29

facts far worse than those here. *Id.* at 175-76. The book in question contained several passages that suggested the plaintiff, Crescenz, who was married, had a sexual relationship with one of the central figures of the book, Bender, who was also married. *Id.* at 175. Similar to the complaint here, the plaintiff in *Crescenz* alleged the author acted negligently when he failed to ask her to verify the nature of her relationship with Bender, despite the fact that Crescenz (upon reading a galley copy of the book) had sent a letter to the publisher before the book's publication to complain that she had been portrayed inaccurately in the book. *Id.* As here, the plaintiff complained that had the author provided her with a copy of the book, she would have corrected the false statements about her. *Id.*

In affirming the district court's grant of summary judgment for the author, the Third Circuit found the author had ample evidence to support the sexual relationship described in the book. *Id.* at 177. In support of this conclusion, the court cited the following evidence: interviews with close associates of Bender who informed the author that they believed Crescenz and Bender were "long-term sexual partners;" review of Bender's handwritten notes stating that Bender and Crescenz spent "all night dancing and singing," and that Crescenz was "[a]lso know[n] as the other wife;" review of an Esquire magazine article that stated Bender's wife knew "all about" Bender's many girlfriends, including "Joan [Crescenz], Frank's assistant and 'second wife;'" and Bender's own statement to the author that he regularly had sex with Crescenz. *Id.* As the Court noted:

> "Having learned of the relationship from the proverbial horse's mouth, it was reasonable for Capuzzo [the author] not to seek further verification from Crescenz. Indeed, Capuzzo had no reason to disbelieve Bender's account of his sexual relationship, especially in light of corroborating statements made by those who knew Bender best."

*Id.* (citing *Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1028 (5th Cir.1975)).  The Court further found that the author's own personal observations, witnessing the two together at social functions and sharing hotel rooms, further bolstered this conclusion.  *Id.*

Indeed, as detailed in Section D of the Statement of Facts, *supra*, the undisputed evidence here shows that Lennon relied on multiple unchallenged sources, including Mallory's novel *Flash*, her memoir *Loving Mailer*, and numerous published articles as sources for the statements made in the Book, so it is plain that it was not even negligent, much less reckless, to forego interviewing her for the Book.  *See Parisi v. Sinclair*, 845 F. Supp. 2d 215, 219 (D.D.C. 2012) (finding that plaintiff fails to plead actual malice when plaintiff cites to passages in defendant's book showing that defendant took steps to verify the statements and relied on multiple sources); *Diario El Pais, S.L. v. The Nielsen Co., (US), Inc.*, No. 07CV11295(HB), 2008 WL 4833012, at *6-7 (S.D.N.Y., Nov. 6, 2008) (finding that plaintiff failed to plausibly plead actual malice when allegations in the complaint show the defendant took actions to ensure that the statements were accurate and therefore did possess a subjective belief of falsity).  Because the alleged failure to interview her is insufficient as a matter of law to allege actual malice, Mallory has failed to prove fault.

**2.     The Undisputed Evidence Shows That Lennon & S&S Did Not Know Any Of the Statements Were False and Did Not Print Them with Reckless Disregard of Their Falsity**

No evidence in this action supports a finding of actual malice, let alone the clear and convincing evidence required.  Instead, all the widely published documentation and numerous interviews Lennon relied upon establish that neither Lennon nor S&S were aware of any evidence that would likely contradict that information.  *First*, as previously discussed in Section II.A. and B., *supra*, the statement that Mallory was "picked up" by a list of men and that she was a "star seducer" were based on Mallory's own published statements.  Similarly, each of the other

statements identified by Mallory and analyzed collectively as Statement Number 1 were fully

sourced and based on materials in the record.  Mallory has not, because she cannot, provided any

evidence to contradict this information, other than her own weak and self-serving statements.

*Second*, the statements that were jointly analyzed by the Court as Statement Number 2

were equally well sourced.  First, as already highlighted above, Mallory candidly detailed

multiple times, in her own memoir and in numerous articles, the various men she slept with and

her sexual exploits.  Lennon also had notes from interviews with Mailer during which he

revealed that Mallory was the "chief model for the lubricious waitress in the opening chapters of

*Harlot's Ghost*."  (Lennon Decl., at ¶¶ 14, 15, Ex. A at LENNON 000016.)  In that same

interview, Mailer also said that while he was sorry about the damage his affair with Mallory had

caused, he nevertheless didn't regret it entirely because he had learned so much from her.  When

Lennon asked what he had learned about, he said, "venality."  (*Id.*)  Lennon also reviewed and

relied on a memo from a reporter for the *New York Post*, which was sent to Mailer's assistant

about a story he was doing on Mallory and Mailer, in which the reporter stated that Mallory

"alleges that the character of Chloe in HG is based on her, which NM told her."  (*Id.* at

LENNON 000017-000019.)

Further supporting Mailer's own statement about learning "venality" from Mallory, there

were multiple sources Lennon reviewed that discussed Mallory's interest in money.  (Lennon

Decl., at ¶ 13.)  These sources included Norris Mailer's memoir, *A Ticket to the Circus*, in which

Norris describes Mallory as the "author of the note asking for a thousand dollars," and "a woman

[Mailer] had been giving money to for nine years…."  (*Id.* at ¶ 15, Ex. A at LENNON 000095-

000099.)  Lennon also had a copy of the note from Mallory referenced by Norris Mailer

promising not to ask for any more money from Mailer.  (*Id.* at LENNON 000015.)

*Third*, regarding the statement that Mallory made a "great scene" in Jack Scovil's office (Statement Number 3), Lennon writes:

> But at one point, her $200-a-week stipend ceased, as Scovil recalled. "Scott would never authorize giving Carole money unless Norman had authorized it. And there was a point where Norman wanted to cut her off and Carole had come up to the office and caused a great scene. She was doing all kinds of things, saying all kinds of things, and that she deserved the money.["]

(Ex. B, Book at 593.)  As indicated in the text, this was a direct quote from an interview of Scovil.  Lennon's notes from that interview reflect this same language.  (Ex. B, Notes at 879; Lennon Decl., ¶ 13.)  Notably, Mallory does not dispute that she was receiving a $200-a-week stipend from Mailer and/or Scovil.  (Sullivan Decl., ¶ 6, Ex. D [Mallory Depo. Tr. at 71:17-19; 158:1-159:12].)  Further, Mallory does not even contest that she may have shown anger in Scovil's office.  (*Id.* [Mailer Depo. Tr. at 71:12-15].)  Mallory's sole contention, based on her own self-serving statements, is that any anger she may have shown wasn't because Mailer was cutting her off, but instead related to money owed for a George Plimpton interview.  (*Id.* [Mallory Depo. Tr. 72:8-12].)  But Mallory provides no evidence, let alone clear and convincing evidence, that either Lennon or S&S were aware of any evidence that would likely contradict the information provided by Scovil.

*Fourth*, regarding Statement Number 5, Mallory first appears to contend that, by quoting an editor who declined to publish Mallory's work, Defendants intentionally omitted reference to her continued success as an author.  However, as the Court already found, the Book does reference Mallory's other published works, including the fact that the Book references her as the author of *Loving Mailer*, *Flash*, and numerous published interviews.  *Mallory*, 168 F. Supp. 3d at 772.  Further, the specific statement at issue is a quote from an interview conducted by Lennon, reflecting: "'I didn't ask any questions, but I guessed he was trying to buy her off because she

33

presented me with a couple of manuscripts which were just ghastly.' She realized that there was nothing she could do with Mallory's work." (Ex. B, Book at 595; Lennon Decl., ¶ 13.) That Mallory was later published, which the Book readily acknowledges, does not establish actual malice.

*Fifth*, regarding the statements implying Mallory's "promiscuity," including Statement Number 6, there is ample material in the record, as discussed in Section D of the Statement of Facts, *supra*, including from interviews of Mallory, that suggest and affirmatively state she was promiscuous. In fact, in the *Mail Online* article Mallory was interviewed for, it affirmatively refers to her "promiscuous lifestyle." (Lennon Decl., ¶ 15; Ex. A at LENNON 000067.) Notably, while Mallory stated she disagreed with a number of statements in that article, she did not disagree with that statement. (Sullivan Decl., ¶ 6, Ex. D [Mallory Dep. Tr. at 176:19-189:15].) Further, she never sought a correction or retraction for the statements made in that article. (*Id.* [Mallory Dep. Tr. 190:7-19].) Relying on previously published news articles is plainly not actual malice, particularly when (like here) they include interviews of Mallory that she never challenged in the intervening years.

*Finally*, regarding the conversation between Plaintiff and Norris Mailer that make up Statement Number 7, Lennon took most of the description of the actual interaction from Norris Mailer's book. Plaintiff's primary complaint appears to be that she is not the "Linda" character referred to in that book. But, as Norris Church's book makes clear, the character in the book was receiving money from Mailer, which Mallory was, and the character authored a note stating she would not ask for more money, which Mallory did. Thus, the reference to "Linda" is clearly Mallory. Indeed, Lennon confirms that Norris told him that the "Linda" in her memoir was in

34

fact referring to Mallory.  (Lennon Decl. ¶ 13.)  Mallory's self-serving statements that she would

never speak to Norris do not establish clear and convincing evidence of actual malice.

### 3. Evidence of Ill Will Is Insufficient to Show Actual Malice and The Evidence Shows Lennon and S&S Did Not "Maliciously" Publish Negative Statements About Mallory

Mallory's claim does not gain traction when she accuses S&S and Lennon of

"maliciously" publishing negative statements about her.  (FAC, ECF No. 61, at 4-7, ¶¶ 13(c),

(g)-(i), 15-16, 26.)  First, that a publication is "one sided or fails to include as many positive

features about the subject as negative ones" fails to allege actual malice as a matter of law.  *Biro*,

963 F. Supp. 2d at 285.  Evidence of "ill will or a defendant's desire to harm the plaintiff's

reputation…does not establish actual malice."  *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d

185, 192 (Pa. Super. Ct. 2003) (citing *Sprague v. Walter*, 656 A.2d 890, 906-07 (Pa. Super. Ct.

1995).  *See also Sprague v. Porter*, 2014 WL 10803063, at *22 ("Writing true things with

disapproval or even ill will is not actual malice….The utterance of something true with

disapproval, or even ill will…cannot be evidence of the 'actual malice' legally necessary to

support this defamation claim.")  Second, as established above, the Book explains in detail about

Mallory's love of Mailer and their journalistic relationship.  (*See* Ex. B, Book, at 593-94, 596-

97.)  Thus, the Book is far from a one-sided "malicious" attack on Mallory.  Further, Mallory

confuses common law malice – irrelevant here – with constitutional actual malice, the standard

of fault applicable where, as here, a public figure sues over statements of public concern.  (FAC,

ECF No. 61, at 4-7, ¶¶ 13(c), (g)-(i), 15-16, 26.); *see Beckley Newspapers Corp. v. Hanks*, 389

U.S. 81, 82-83 (1967) (per curiam) (distinguishing common law malice from constitutional

actual malice).  Such allegations of common law malice are insufficient to allege actual malice.

*See Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir.

2012) (finding allegations that defendant "intended to harm" plaintiff insufficient); *Egiazaryan v.*

*Zalmayev*, No. 11 Civ. 2670(PKC), 2011 WL 6097136, at *8 (S.D.N.Y., Dec. 7, 2011) (rejecting allegations regarding defendant's hostility to plaintiff). Thus, Lennon's supposed motivation for including the statements Mallory complains of is irrelevant to the actual malice analysis.

Mallory's claims against S&S are equally unavailing. S&S had every reason to rely on Lennon and his detail on the life and background of Mailer. Lennon is the country's foremost Mailer scholar, having edited, authored and co-authored numerous books about and with Mailer. (Lennon Decl. ¶¶ 2-5; Bender Decl., ¶ 10.) Further, having known Mailer since 1972, he had incredible access to all the key individuals (not the least being Mailer). (Lennon Decl. ¶ 7; Bender Decl., ¶ 10.) Moreover, with regard to the specific portions of the Book that discuss Mallory, they appeared entirely consistent with previously published information concerning Mallory, as well as a number of first hand sources. "The law is clear, however, that a book publisher has no independent duty to investigate an author's story unless the publisher has actual, subjective doubts as to the accuracy of the story." *Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009) (citing *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003); *Hotchner v. Castillo–Puche*, 551 F.2d 910, 914 (2d Cir. 1977) (holding that publisher's "failure to conduct an elaborate independent investigation did not constitute reckless disregard for truth")). As the First Circuit has explained

> "To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid."

*Id.* (citing *Geiger v. Dell Pub. Co.*, 719 F.2d 515, 518 (1st Cir. 1983)). "A book publisher is permitted to rely on an author's reputation and experience without having to independently fact-check a book." *Id. See also McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1389–90

(S.D.N.Y.1981) (denying summary judgment as to author but granting as to publisher because publisher was "entitled as a matter of law to rely on [author's] proven reportorial ability").  As the Third Circuit held in affirming summary judgment for the publisher on defamation and false claims:

> "Penguin had no reason to doubt Capuzzo's [the author's] work; Capuzzo was a well respected journalist and best-selling author, who had been nominated several times for a Pulitzer Prize…Capuzzo's extensive research, the culmination of seven years of personal observation and interviews, supported his conclusion that Bender and Crescenz were sexual partners.
>
> ***
>
> Accordingly, like the District Court, we find no dispute of material fact as to whether Penguin acted reasonably in following industry custom and relying on Capuzzo's warranties.  Penguin acted like any other conscientious publisher…it did not have a duty to independently investigate the book's facts, relied on a reputable author, and had the book vetted by experienced outside counsel. Thus, Penguin is entitled to summary judgment on Crescenz's defamation claim as a matter of law."

*Crescenz*, 561 F. App'x at 179–80.

Because there is no credible evidence, let alone clear and convincing evidence, that Lennon or S&S acted with actual malice, the Court should grant Defendants' motion for summary judgment as to her defamation and false light claims.

## IV.

### THERE IS NO TRIABLE ISSUE THAT PLAINTIFF HAS FAILED TO ESTABLISH A CAUSE OF ACTION FOR FALSE LIGHT

Mallory's false light claim is effectively duplicative of her libel claim, but it fails as a matter of law for the same reasons as the defamation claim.  To prove a claim for false light under Pennsylvania law, Plaintiff must produce evidence showing that S&S and Lennon "publishe[d] material that [1] 'is not true, [2] is highly offensive to a reasonable person, and [3]

37

is publicized with knowledge or in reckless disregard of its falsity.'" *Graboff*, 744 F.3d at 136

(quoting *Larsen v. Phila. Newspapers, Inc.,* 543 A.2d 1181, 1188 (Pa. Super. 1988) (en banc)

(citing Restatement (Second) of Torts § 652E); *see also Vogel v. W.T. Grant Co.,* 327 A.2d 133,

135–36 (Pa. 1974) (adopting Restatement (Second) definitions for all four invasion of privacy

claims).  Alternatively, a false light claim can be established where a defendant discriminately

publicizes true statements to imply falsehoods about the plaintiff.  *Santillo v. Reedel*, 634 A.2d

264, 267 (Pa. Super. Ct. 1993) (citing *Larsen*, 543 A.2d 1181).  This alternative theory, as

recognized by the Third Circuit, is based on the innuendo theory of defamation law.  *Graboff*,

744 F.3d at 137.  Here, the undisputed evidence shows that Mallory has failed to prove a claim

of false light.

As already discussed above, all of Mallory's claims for false light fail because she has

failed to show actual malice.  Her claims also fail for the following reasons.

*First*, the "100 percent sexual" statement, Statement Number 4, was held by the Court to

be pure opinion.  "False light liability may not be predicated upon someone's expressed opinion

'unless the alleged behavior upon which the opinion was based did not actually occur, or the

opinion was far out of proportion with the facts.'"  *Sprague v. Porter*, 2014 WL 10803063, at

*26 (granting summary judgment on false light claim on grounds of opinion and other grounds)

(quoting *Parano v. O'Connor*, 641 A.2d 607, 610 (Pa. Super. Ct. 1994) [dismissing false light

claim on grounds of opinion]).  *See also Jones v. City of Philadelphia*, 73 Pa. D. & C.4th 246,

261-62 (Pa. Com. Pl. Phila. Cty. 2005) (dismissing false light claim on grounds of opinion),

*aff'd*, 893 A.2d 837, 844-45 (Pa. Commw. Ct. 2006); *Richette v. Philadelphia Magazine*, No.

802, 1996 WL 756954, at *2 (Pa. Com. Pl. May 28, 1996) (same).

*Second*, Mallory has failed to establish falsity.  Under Pennsylvania law, "[f]alsity . . . carries the same meaning in the defamation and false-light-invasion-of-privacy contexts." *Graboff*, 744 F.3d at 137.  To be actionable, falsity "'must go to the gist or sting'" of the statement, meaning the statement "as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 136 (quoting *Dunlap v. Phila. Newspapers, Inc.,* 448 A.2d 6, 15 (Pa. Super. Ct. 1982)).  Mallory's theory is that, had Lennon interviewed her, she would have provided additional information about subjects the Book already addresses, such as the professional aspects of her relationship with Mailer, her journalistic career, and her writing.  (FAC, ECF No. 61, at 2-6, ¶¶ 13(a)-(i).)  It is not plausible that the "gist" or "sting" of the challenged statements are substantially false given that the Book already describes these aspects of her relationship with Mailer.  Nor does she allege that the material S&S and Lennon published reasonably implies substantially false facts.  *Graboff*, 744 F.3d at 136-37.  Contrary to Mallory's allegations, S&S and Lennon have no duty to supplement true statements with additional facts to convey the most flattering portrayal of Mallory.  *See Santillo v. Reedel*, 634 A.2d 264, 267 (Pa. Super. Ct. 1993) (holding that plaintiff did not state a cognizable false light claim because police officers who truthfully confirmed reports that a complaint was made against plaintiff, another police officer, did not have a duty to tell reporters that plaintiff also received commendations as a police officer).

*Third*, as with the defamation claim, Mallory does not state a false light claim because the statement that she is a "star seducer" is an expression of opinion that does not imply false, verifiable facts, because it is an opinion based on Mallory's own statements regarding the men she slept with.  "False light liability may not be predicated upon someone's expressed opinion 'unless the alleged behavior upon which the opinion was based did not actually occur, or the

39

opinion was far out of proportion with the facts.'" *Sprague v. Porter*, 2014 WL 10803063, at

*26 (granting summary judgment on false light claim on grounds of opinion and other grounds)

(quoting *Parano v. O'Connor*, 641 A.2d 607, 610 (Pa. Super. Ct. 1994) [dismissing false light

claim on grounds of opinion]). *See also Jones v. City of Philadelphia*, 73 Pa. D. & C.4th 246,

261-62 (Pa. Com. Pl. Phila. Cty. 2005) (dismissing false light claim on grounds of opinion),

*aff'd*, 893 A.2d 837, 844-45 (Pa. Commw. Ct. 2006); *Richette v. Philadelphia Magazine*, No.

802, 1996 WL 756954, at *2 (Pa. Com. Pl. May 28, 1996) (same).

*Finally*, Mallory's false light claim fails because none of the challenged statements are

"highly offensive" and involve "publicity, given to *private* facts ... which are not of legitimate

concern to the public." *See Sprague v. Porter*, 2014 WL 10803063, at *26 (quoting *Strickland v.

Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997) (emphasis in original)).  Mallory

wrote an entire memoir about her adulterous affair with Mailer and then, and in numerous press

interviews, Mallory forthrightly discusses -- even brags about -- her numerous conquests of

famous men.  Mallory is in no position to plausibly claim that the Book's depiction concerned

private or offensive information.  Defendants merely repeated what Mallory already stated

publicly, followed by Scovil's opinion about those statements.  Thus, for the same reasons

Mallory's defamation claim is non-actionable as opinion, her false light claim is also not

actionable.

## CONCLUSION

For the foregoing reasons, Defendants S&S and Lennon, respectfully request that the

Court grant summary judgment as to Mallory's claims against them.

**Dated: December 22, 2016**
(refiled with pagination
on December 27, 2016)

Respectfully submitted,


/s/Andrew A. Chirls
Andrew A. Chirls
Christina Capobianco
FINEMAN KREKSTEIN & HARRIS P.C.
Ten Penn Center
1801 Market Street, Suite 1100
Philadelphia, PA 19103
215-893-9300
achirls@finemanlawfirm.com
ccapobianco@finemanlawfirm.com

Elizabeth A. McNamara (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
27th Floor
New York, New York 10019
212-489-8230
lizmcnamara@dwt.com

Sean M. Sullivan (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, California 99017-2566
213-633-8644
seansullivan@dwt.com

*Counsel for Defendants Simon & Schuster, Inc. and
J. Michael Lennon*

41

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLE MALLORY, | : | |
| Plaintiff, | : | |
| v. | : | CIV. NO. 14-5702-JHS |
| SIMON & SCHUSTER, INC. | : | |
| and | : | |
| J. MICHAEL LENNON, | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I, Andrew A. Chirls, hereby certify that on this 27th day of December, 2016, a true and correct copy of the foregoing Corrected Memorandum of Law in Support of Simon & Schuster, Inc. and J. Michael Lennon's Motion for Summary Judgment, was served via ECF and/or first class mail, upon the following parties:

Matthew B. Weisberg
David A. Berlin
L. Anthony DiJiacomo, II
Weisberg Law
7 South Morton Avenue
Morton, PA 19070

_____/s/Andrew A. Chirls_____
Andrew A. Chirls
FINEMAN KREKSTEIN & HARRIS P.C.
Ten Penn Center
1801 Market Street, Suite 1100
Philadelphia, PA 19103
215-893-9300
achirls@finemanlawfirm.com

{01220242;v1}