IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROLE MALLORY, | |
| Plaintiff, | |
| v. | CIVIL ACTION
NO. 14-5702 |
| S & S PUBLISHERS, et al., | |
| Defendants. | |

## OPINION

**Slomsky, J.**                                                     **May 9, 2017**

## I.      INTRODUCTION

This case involves allegations of defamation arising from a 2013 biography entitled Norman Mailer: A Double Life.  From 1983 to 1992, Plaintiff Carole Mallory was romantically involved with the late American writer Norman Mailer.  In 2013, six years after Mailer's death, Defendant Simon and Schuster, Inc. published Norman Mailer: A Double Life, written by Defendant J. Michael Lennon.  The biography "captures Mailer in all his sharp complexities and shows us how he self-consciously invented and reinvented himself throughout his lifetime."  J. Michael Lennon, Norman Mailer: A Double Life, inside cover (2013).  Though the biography discusses Mallory and Mailer's relationship, Mallory was never contacted to review the book before publication.  She now brings this suit for defamation, alleging that the biography mischaracterized her relationship with Mailer as being "strictly sexual" when in fact the two were in a "long-time, loving relationship."  (Doc. No. 61 at ¶ 10.)  Defendants have filed a Motion for Summary Judgment, which is now ripe for a decision.  (Doc. Nos. 93-94.)

## II.     BACKGROUND

Plaintiff Carole Mallory has worked as a supermodel, writer, and journalist.  (Doc. No. 61 at ¶ 10.)    She currently resides in Pennsylvania.  (Id. at ¶ 3.)  In the 1970s and 1980s, she appeared in films including The Stepford Wives.  (Doc. No. 101 at 4.)  During the 1980s and 1990s, Mallory had an eight-year affair with Norman Mailer.  (Id. at 6.)  Mallory is the author of a 2009 memoir titled Loving Mailer, which chronicles the affair.  (Id. at 5.)  Mallory and Mailer's relationship is at the heart of the instant lawsuit.

Norman Mailer: A Double Life (the "Biography") was written by Defendant J. Michael Lennon and published by Defendant Simon & Schuster, Inc. in 2013.  (Id. at 6.)  According to the inside cover of the book:

> Michael Lennon knew Mailer for thirty-five years, and in writing this biography, he has had the cooperation of Mailer's late widow, Norris Church,[1] his ex-wives, and all of his children, as well as his sister, Barbara.  He also had access to Mailer's vast, unpublished correspondence and papers, and he interviewed dozens of people who knew Mailer.  *Norman Mailer: A Double Life* gives us the man in full, a remarkable and unique figure in the context of his times.

J. Michael Lennon, Norman Mailer: A Double Life (2013).

Mallory contests her portrayal in the Biography.  She alleges that the Biography suggests false perceptions of her relationship with Norman Mailer, implying that their relationship was based solely on sex, money, and publicity.  (Doc. No. 101 at 15.)  She further claims that Defendant Lennon never attempted to contact her to confirm facts regarding her relationship with Mailer.  (Id. at 13.)  According to Mallory, if Lennon had made an effort to interview her, she would have informed him that various statements made in the Biography are false.  (Doc. No. 61 at ¶ 13.)  Specifically, Mallory objects to Lennon's portrayal of her as a "venal harlot"

---

[1] Norris Church was married to Mailer from 1980 to 2007.  Lennon, supra, at 525.

who seduced celebrities to advance her career and who was only interested in Mailer for his wealth and professional assistance. (Id.)

Mallory notes that the Biography has been published to third parties and is available for purchase both in stores and online. (Id. at ¶ 14.) She claims that as a result of Defendants' "malicious publication," her reputation has been diminished and she has suffered severe emotional distress and financial loss. (Id. at ¶¶ 15-16.)

On October 6, 2014, Mallory instituted this action pro se against Defendants Simon and Schuster, Inc. ("S & S Publishers"), Ivan Fisher, Esquire (Mailer's lawyer), author J. Michael Lennon, the estate of Norman Mailer, the estate of Norris Church, and Jack Scovil (Mailer's literary agent).[2] (Doc. No. 1.) As a pro se litigant, she filed an Amended Complaint on October 9, 2014 (Doc. No. 3), and a Second Amended Complaint and then a Third Amended Complaint on November 3 and 5, 2014, respectively (Doc. Nos. 12, 7).

Defendants filed a Motion to Dismiss on January 16, 2015. (Doc. No. 37.) On May 11, 2015, the Court held a hearing on the Motion. (Doc. No. 57.) Mallory had obtained counsel prior to the hearing, and her lawyer appeared on her behalf. On June 17, 2015, Mallory filed a counseled Fourth Amended Complaint ("FAC"), which became the operative pleading in this case. (Doc. No. 61.) In Count I of the FAC, Mallory set forth four separate theories of defamation: (1) defamation; (2) defamation per se; (3) false light; and (4) commercial disparagement-injurious falsehood. (Id. at 6.) On July 9, 2015, Defendants filed a Motion to

---

[2] Ivan Fisher, the estate of Norman Mailer, the estate of Norris Church, and Jack Scovil were terminated as parties on April 7, 2015. As such, the remaining Defendants are J. Michael Lennon and S & S Publishers.

Dismiss the FAC.[3]  (Doc. No. 65.)  Mallory filed a Response in Opposition to the Motion, and Defendants filed a Reply.  (Doc. Nos. 70, 72.)  On March 10, 2016, by Order and Opinion, the Motion to Dismiss was granted in part and denied in part.  (Doc. Nos. 75-76.)  Plaintiff's commercial disparagement-injurious falsehood claim was dismissed in its entirety.  (Id.)  In addition, certain statements Plaintiff relied upon to support a defamation claim were found to be incapable of defamatory meaning, and therefore part of this claim was also dismissed.  (Id.)  Thereafter, Defendants S & S Publishers and J. Michael Lennon filed an answer to the FAC. (Doc. No. 77.)

After discovery was completed, Defendants filed a Motion for Summary Judgment. (Doc. Nos. 93-94.)  On January 31, 2017, Plaintiff filed a Response in Opposition to the Motion. (Doc. No. 101.)  On February 14, 2017, Defendants filed a Reply.  (Doc. No. 106.)

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

---

[3] Defendants' first Motion to Dismiss was denied as moot without prejudice after the FAC was filed.  (Doc. No. 62.)

(1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (quotation omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247-49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.    ANALYSIS

As noted above, Plaintiff alleges claims of defamation, defamation per se, and false light. Each claim will be discussed in turn, starting with the defamation claim.

### A.  Mallory's Defamation Claim

Defendants argue in the Motion for Summary Judgment that Plaintiff's defamation claim should be dismissed for two reasons.  (Doc. No. 94 at 26.)  First, Defendants contend that the two statements alleged to be defamatory are not capable of defamatory meaning as a matter of law.  (Id.)  Second, Defendants argue that Plaintiff has failed to identify evidence showing a

genuine issue of material fact regarding whether Defendants acted with actual malice. (Id. at 26-27.) For reasons that follow, this Court agrees and will grant summary judgment on the defamation claim.

### i. Defamation Standard

To successfully establish a claim of defamation,[4] a plaintiff has the burden of proving:

(1) The defamatory character of the communication;
(2) Its publication by the defendant;
(3) Its application to the plaintiff;
(4) The understanding by the recipient of its defamatory meaning;
(5) The understanding by the recipient of it as intended to be applied to the plaintiff;
(6) Special harm resulting to the plaintiff from its publication; and
(7) Abuse of a conditionally privileged occasion.

Joseph v. Scranton Times, L.P., 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa. Const. Stat. Ann. § 8343(a)).

In a defamation action, the Court must make a threshold determination of whether a challenged statement is capable of defamatory meaning. Gibney v. Fitzgibbon, 547 F. App'x 111, 113 (3d Cir. 2013); see also Byars v. Sch. Dist. of Phila., 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) ("Whether a statement is capable of a defamatory meaning is a question of law for the court."). "If [it is] not, the claim must be dismissed." Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir. 2001).

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 215 (Pa. 1981) (quoting Birl v. Philadelphia Elec. Co., 167 A.2d 472, 472 (Pa. 1960)); see also Mathias v.

---

[4] Jurisdiction in this case is based on diversity of citizenship. A federal district court in a case arising under diversity of citizenship jurisdiction applies state law on substantive legal issues. Schmigel v. Uchal, 800 F.3d 113, 119 (3d Cir. 2015).

Carpenter, 587 A.2d 1, 2 (Pa. Super. Ct. 1991) (a court must "determine whether the statement was maliciously written or published and tended 'to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession.'").  "It is not enough that the victim of the 'slings and arrows of outrageous fortune', be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society."  Scott-Taylor, Inc. v. Stokes, 229 A.2d 733, 734 (Pa. 1967).  Thus, for Mallory to prevail, "the statement must do more than merely embarrass or annoy [her]; it must provoke 'the kind of harm which has grievously fractured [her] standing in the community of respectable society.'"  Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (quoting Tucker v. Phila. Daily News, 848 A.2d 113, 124 (Pa. 2004)).

In determining whether a statement is capable of defamatory meaning, a court must view the statement in context.  The Pennsylvania Supreme Court has stated:

> [W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, [and] the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

Tucker, 848 A.2d at 124 (quoting Thomas Merton, 442 A.2d at 216).

"Importantly, only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law[,]" and "[i]n order for an opinion to be deemed capable of defamatory meaning under Pennsylvania law, it must reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion."  Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (internal quotations omitted).  The Third Circuit has explained the distinction between actionable and non-actionable opinions as follows:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

Redco Corp. v. CBS, Inc., 758 F.2d 970, 972 (3d Cir. 1985); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) ("a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection"); Krajewski v. Gusoff, 53 A.3d 793, 803 (Pa. Super. Ct. 2012) (dismissing libel claims as to publications that were "matters of opinion" and "neither reported nor implied facts that were provably false"). Whether a statement is a non-actionable matter of opinion is a question to be resolved by the trial court as a matter of law. See Mzamane, 693 F. Supp. 2d at 481 ("Whether a statement qualifies as a true opinion or an 'opinion' which implies the existence of undisclosed derogatory facts is a question of law to be resolved by the Court."); Kurowski v. Burroughs, 994 A.2d 611, 619-20 (Pa. Super. Ct. 2010) (affirming the trial court's grant of summary judgment where allegedly defamatory remarks were deemed non-actionable statements of opinion). With these principles in mind, the Court will examine each of the allegedly defamatory statements which remain at issue in this case.[5] Then, it will determine whether Plaintiff has put forth sufficient evidence showing that Defendants made these statements with actual malice.

---

[5] The FAC alleged that seven statements from the Biography were defamatory. However, the Court previously found that five of the seven statements were not capable of defamatory meaning, and therefore these statements were excluded from forming the basis of any claims Plaintiff alleged. For a discussion of these five statements which were dismissed, see Doc. No. 75.

ii.    **Statements At Issue**[6]

   a)    **Defamatory Statement Number 1 Is Incapable of Defamatory Meaning Because It Contains Plaintiff's Own Words and a Non-Actionable Opinion**

Mallory cites a portion of the book that she alleges discredits her "self-made achievements attained through hard work by painting a false impression that Plaintiff solely used sex and seduction of celebrities to get ahead, which was not true":

> Sometime in the mid-1980s, Mailer asked [his agent] to send money to a new mistress, Carole Mallory, a former cover model for major magazines like *New York* and *Cosmopolitan* who also had small roles in a few films in the 1970s including *Take This Job and Shove It*. A large poster (which she gave Mailer) for this film, depicting a curvaceous Mallory in a bikini bottom and torn, scanty T-shirt, rivaled sales of Farrah Fawcett's famous swimsuit poster. Jack Scovil, who handled the transfer of funds, said that he was "surprised that Norman would get involved with someone like that," referring to Mallory's reputation as a star seducer. In several interviews, numerous gossip column snippets, and a 2009 memoir, Mallory lists the men that she had "picked up," including Clint Eastwood, Robert De Niro, Warren Beatty, Richard Gere, Sean Connery, Anthony Hopkins, Peter Sellers—she said Brits were "more fun than Americans" . . . .

(Doc. No. 61 at ¶ 13(a) (quoting Lennon, <u>supra</u>, at 592-93).)

Mallory objects to this passage because she maintains that it "paint[s] a false impression that Plaintiff solely used sex and seduction of celebrities to get ahead." (Doc. No. 61 at ¶ 13(a).) Defendants argue that the Biography does not defame Mallory by stating that she "picked up" stars because the Biography quotes directly from Mallory's own memoir for that assertion. (Doc. No. 65-2 at 23.) In addition, Defendants argue that the term "star seducer" is an opinion that cannot serve as the basis for Mallory's defamation claim.

Truth is an affirmative defense under Pennsylvania law. Pa. Const. Stat. Ann. § 8343(b)(1); <u>see also</u> <u>Graboff v. Colleran Firm</u>, 744 F.3d 128, 136 (3d Cir. 2014) (internal

---

[6] In the FAC, the quotations of the Biography are not always accurate. Accordingly, the quotations here are taken from the Biography.

citations omitted) ("A defendant may avoid liability for defamation if it shows that its statements were 'substantially true'"). "Under Pennsylvania law, proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter; the test is whether the alleged libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Emekekwue v. Offor, 26 F. Supp. 3d 348, 362 (M.D. Pa. 2014) (quoting Keeshan v. The Home Depot, U.S.A., Inc., No. 00-0529, 2001 WL 310601, at *15 (E.D. Pa. Mar. 27, 2001)).

For example, in Rossi v. Schlarbaum, the district court found that the defendant's statement on the voicemail of an agent for a third party investor in the plaintiff's business stating that the plaintiff was a strip club dancer and was not "pioneering for women" was not defamatory under Pennsylvania law. 600 F. Supp. 2d 650, 666 (E.D. Pa. 2009). The plaintiff was in fact a strip club dancer, so this part of the statement was true and was incapable of defamatory meaning. Id. In addition, the remainder of the statement was the defendant's non-actionable opinion based on facts. Id.

Here, the statement that Mallory "picked up" men, "including Clint Eastwood, Robert De Niro, Warren Beatty, Richard Gere, Sean Connery, Anthony Hopkins, [and] Peter Sellers" comes from Mallory's own memoir entitled Loving Mailer. The direct quote from Loving Mailer reads as follows:

> Because of my looks I'd picked up Bobby DeNiro, Sean Connery, Richard Gere, Peter Sellers, Matt Dillon, Marcello Mastroianni, Warren Beatty, Rod Stewart, Clint Eastwood, and Rip Torn.

Carole Mallory, Loving Mailer at 24 (2009). The statement that Mallory "picked up" famous men made in the Biography, viewed in context, does not tend to suggest something different from Mallory's own memoir, even if the names do not precisely match. The statement does not

imply something false, as Mallory alleges. In addition, when reading the statement in the Biography, the average reader would not believe that Mallory was a prostitute, as she contends. (Doc. No. 101 at 16-17.) As a result, the statement is incapable of defamatory meaning and cannot serve as the basis of Mallory's defamation claims.

In addition, Defendants argue that the term "star seducer" is an opinion that cannot serve as the basis for Mallory's defamation claim. As previously noted, "only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). "Expressions of opinion are not actionable unless they imply undisclosed, false and defamatory facts." Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 308 (E.D. Pa. 2006). Here, the Biography refers to Mallory as a "star seducer." This is a non-actionable opinion based on the true facts from Mallory's memoir, Loving Mailer, in which she details the discussion she had with Mailer about how she previously "picked up" several famous men. See Mallory, supra, at 24. For these reasons, this statement is not capable of defamatory meaning as a matter of law, and cannot serve as the basis of any defamation, defamation per se or false light claims.

        **b)**        **Defamatory Statement Number 2 Is Capable of Defamatory Meaning**

Mallory alleges that the following excerpts "falsely paint her as venal":

He told Mike Lennon that he learned something about venality from Mallory and used it in the creation of Chloe, the sexy waitress in the opening chapters of *Harlot's Ghost*. . . .

Mailer found some kind of moral balance in regard to Mallory, enough to continue with her for almost eight years. Like Faust, he was greedy for knowledge and ready to trade punishment to gain it. "The more prohibited the act, the greater the lure for Mailer," according to Rader. "He wanted to know everything."

(Id. at ¶ 13(f) (quoting Lennon, supra, at 657).)  Citing another portion of the Biography, Mallory alleges that Defendant Lennon stated "with malicious intent that Plaintiff was a venal harlot" when he wrote that Harlot's Ghost "was not Norris's [Mailer's wife] favorite book, especially after she learned that Mallory was the model for the sluttish Maine waitress, Chloe."  (Doc. No. 61 at ¶ 13(i) (quoting Lennon, supra, at 661).)

Defendants observe that Mallory does not contest that Mailer based a character in his book Harlot's Ghost on her, and "Mallory otherwise fails to allege how or why these statements are defamatory or even false."  (Doc. No. 65-2 at 24.)  Defendants further assert that the statement that Mailer "learned something about venality" from Mallory is no more than "non-actionable hyperbole."  (Doc. No. 65-2 at 29 (citing Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 14 (1970) (holding that, regarding the allegedly defamatory use of the word "blackmail" in a newspaper article, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable")).)

The Biography does not specifically refer to Mallory as a "venal harlot," and even if it did, "[a] certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more."  W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 111, at 776 (5th ed. 1984).  However, courts have found statements implying promiscuity to be reasonably susceptible to defamatory meaning.  See, e.g., Smith v. Stewart, 660 S.E.2d 822, 831-32 (Ga. Ct. App. 2008) (finding the portrayal of a fictional character, allegedly based on the plaintiff, as alcoholic and promiscuous was defamatory).  Therefore, this statement may be capable of defamatory meaning.

### iii. Actual Malice

Plaintiff contends that she has set forth sufficient evidence showing Defendants acted with actual malice when publishing the above statements in the Biography. (Doc. No. 101 at 23.) When a limited purpose public figure sues for defamation,[7] the First Amendment demands that the plaintiff prove both that the statement was false and that it was made with "actual malice." Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1087 (3d Cir. 1985) (referencing New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964)). Whether a plaintiff has pointed to evidence in the record sufficient to support a finding of actual malice is a question of law. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 685 (1989).

Under New York Times v. Sullivan, actual malice means "knowledge that [the statement] was false . . . or reckless disregard of whether it was false or not." 376 U.S. at 279-80. A limited purpose public figure must produce "sufficient evidence to permit the conclusion that the defendant entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). "[A] court ruling on a motion for summary judgment must be guided by the New York Times 'clear and convincing' standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice has been shown with convincing clarity." Anderson v. Liberty Lobby, 477 U.S. 242, 257 (1986) (citing New York Times, 376 U.S. at 279-80.)

Courts have routinely held that failure to investigate, without more, does not demonstrate actual malice. See Harte-Hanks Commc'ns, Inc., 491 U.S. at 688-89 (finding that a newspaper's failure to investigate does not support a finding of actual malice, but purposeful avoidance of the

---

[7] Plaintiff has admitted that she is a limited purpose public figure for purposes of this case. (Doc. No. 75 at 10, n.9.)

truth may); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 332 (1974) ("Mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth."); Tucker v. Fishbein, 237 F.3d 275, 286 (3d Cir. 2001) ("failure to investigate, standing alone, does not constitute actual malice."); McDowell v. Paiewonsky, 769 F.2d 942, 951 (3d Cir. 1985) (finding that "[w]hile it may have been negligent" for the defendant "not to have checked independently the veracity" of certain statements, the defendant's fault did not rise to the level of actual malice where the defendant had relied on official reports and news accounts); Coughlin v. Westinghouse Broad. and Cable, Inc., 603 F. Supp. 377, 387 (E.D. Pa. 1985) ("Evidence of failure to investigate, . . . is also insufficient to show that [the] defendant acted with malice."); Tucker v. Philadelphia Daily News, 848 A.2d 113 (Pa. 2004) ("Failure to check sources, or negligence alone, is simply insufficient to maintain a cause of action for defamation."); Blackwell v. Eskin, 916 A.2d 1123, 1126 (Pa. Super. Ct. 2007) ("even if [the defendant were] to be deemed negligent for failure to investigate, either by obtaining independent confirmation of his information or consulting other, possibly more reliable sources, that finding would be insufficient to demonstrate actual malice.").

For instance, in Tucker v. Fishbein, the Third Circuit held that the public figure plaintiffs failed to point to evidence in the record demonstrating that a reporter for Time, and Time itself, acted with actual malice in publishing statements about the plaintiffs' allegedly impaired sex life, which was based upon the plaintiffs' loss of consortium claim raised in a lawsuit against the estate of Tupac Shakur. 237 F.3d at 280-81, 286-87. The Third Circuit relied on the reporter's sworn testimony in her deposition to affirm the grant of summary judgment in their favor. Id. at 286-87. In the deposition, the reporter explained that she had relied on her interview with the lawyer representing Shakur's estate and other articles when publishing the piece for Time. Id. at

14

281. The Third Circuit found that from the record, the reporter and <u>Time</u> were not aware of any falsity in the statements made about the plaintiffs' sex life, and did not act with actual malice in failing to further investigate. <u>Id.</u> at 286-87. As a result, summary judgment in favor of these defendants was affirmed. <u>Id.</u> at 287.

Mallory asserts a single ground for holding that Defendants acted with actual malice. She contends that Lennon's failure to contact her before publishing the Biography shows his "reckless disregard for the truth," i.e., actual malice. (Doc. No. 61 at ¶ 12; Doc. No. 101 at 23.) Specifically, she writes that Lennon "made no efforts to confirm any fact relating to the relationship between" Mallory and Mailer. (Doc. No. 61 at ¶ 13.) Had Lennon made an effort to interview her, Mallory would have informed him that the statements were false. (<u>Id.</u>) These allegations merely assert that Lennon failed to investigate Mallory's relationship with Mailer before writing statements about her in the Biography. As noted, a failure to investigate, without more, is not sufficient to show actual malice. <u>See, e.g.</u>, <u>Tucker</u>, 237 F.3d at 286.

Like <u>Tucker</u>, Mallory has not advanced facts showing actual malice. She fails to point to any evidence in the record, be it in an affidavit or otherwise, to demonstrate that Lennon or S & S Publishers acted with knowledge or reckless disregard for the truth. Rather, the evidentiary record supports the opposite conclusion.

The sworn declaration of Defendant J. Michael Lennon demonstrates that he thoroughly investigated Mailer's life, including his relationship with Mallory, in connection with writing the Biography. For example, when researching for the Biography, Lennon interviewed approximately eighty-five people. (Lennon Decl. at ¶ 7.) Having known Mailer as a close friend since 1972, Lennon had access to "key individuals" to write the book. (<u>Id.</u>) He read Mailer's notes, "numerous articles and published interviews, and a number of books and

autobiographies." (Id. at ¶ 8.) Lennon notes that he "relied upon over a thousand different sources for the Book." (Id.) He also stated that he prioritized interviews based on the importance of the person in Mailer's life, the other information readily available about the person, and the person's health. (Id. at ¶ 9.) Information about Mallory was easily available through "a wealth of published sources about her relationship with" Mailer. (Id. at ¶ 11.) These sources included:

> Ms. Mallory's memoir, *Loving Mailer*; her novel, *Flash*; a half-dozen of Ms. Mallory's interviews with Mr. Mailer; and a clip file of her public statements to the press, many of which were given to Mr. Mailer.

(Id.) Lennon also relied upon personal email correspondence with Mallory and interviews with a number of other people who had known about her relationship with Mailer. (Id. at ¶ 13.) After reviewing all of this information, Lennon believed he had a consistent and accurate picture of the relationship between Mallory and Mailer. "Given this wealth of consistent information concerning Ms. Mallory, including her own memoir and prior interviews, [Lennon] did not see any reason to separately interview her for the Book." (Id. at ¶ 16.)

In addition, the sworn declaration of Robert Bender, Vice President and Executive Editor of Simon & Schuster, Inc., demonstrates that S & S Publishers reasonably relied on Lennon to accurately portray Mailer's life in the Biography. (Bender Decl. at ¶ 6.) S & S Publishers relied on Lennon to accurately write facts about Mailer's life because Lennon "is the country's foremost Norman Mailer scholar." (Id. at ¶ 10.) S & S Publishers knew that Lennon "had edited, authored or co-authored a number of books about Norman Mailer and his writings, including *Pieces and Pontifications* (1982), *Critical Essays on Normal Mailer* (1986), *Conversations with Norman Mailer* (1988), *Norman Mailer: Works and Days* (2000), *The Spooky Art: Some Thoughts on Writing* (2003), and *Norman Mailer's Letters on An American*

*Dream,1963-69* (2004). (Id.) S & S Publishers also knew that Lennon was a long-time friend of Mailer and had access to many people in Mailer's life. (Id. at ¶ 11.) Based on these facts, S & S Publishers reasonably relied upon and believed that Lennon would accurately portray Mailer's life in the Biography. Nothing in the record advances Mallory's contrary assertion that S & S Publishers acted with knowledge of the falsity, or reckless disregard for the truth, of any statements about her in the Biography.

Ultimately, Defendants have pointed to evidence demonstrating that they did not act with actual malice in publishing the statements about Mallory in <u>Norman Mailer: A Double Life</u>. No issue of material fact exists in this regard. Mallory offers nothing more at this late stage than her own conclusory allegations, unsupported opinions, and suspicions that Defendants acted inappropriately when publishing the Biography, all of which are insufficient to establish a genuine issue of material fact. Moreover, she has not met her burden of producing specific facts showing that a genuine issue of material fact exists and that a reasonable jury could rule in her favor. Mallory has not identified any evidence from which a reasonable jury could find that Lennon or S & S Publishers were on notice that the statements made in the Biography were false. She alleges nothing more than Lennon's failure to interview her for the Biography. As a result, there is no genuine issue of material fact in the record regarding whether Defendants acted with actual malice. For this reason, Mallory has not sustained a claim of defamation against Defendants. Summary judgment will be granted for Defendants on the defamation claim.

**B. Defendants' Motion for Summary Judgment Will Be Granted on Mallory's Defamation Per Se and False Light Claims Because Plaintiff is Unable to Point to Specific Facts Showing Actual Malice**

In addition to a claim of defamation, Mallory alleges claims of defamation per se and false light. Defendants argue that these claims must be dismissed because, like the defamation

claim, Plaintiff has not tendered sufficient evidence showing Defendants acted with actual malice in publishing statements contained in the Biography. Each cause of action will be discussed in turn.

### i. Defamation Per Se

Mallory's second claim alleges the state tort of defamation per se. Under Pennsylvania law, "[d]efamation *per se* can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999), aff'd sub nom., Synygy, Inc. v. Scott-Levin, 229 F.3d 1139 (3d Cir. 2000) (quoting Clemente v. Espinosa, 749 F. Supp. 672, 677 (E.D. Pa. 1990)). When a limited purpose public figure raises a defamation per se claim, she must show by clear and convincing evidence that the defendant acted with actual malice in publishing statements about her. See, e.g., Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1087 (3d Cir. 1985) (holding that the plaintiff did not prove actual malice to prevail on his defamation per se claim against the defendant); see also Gertz v. Welch, 418 U.S. 323 (1974) (discussing actual malice in the context of the plaintiff's defamation per se claim).

In this case, Plaintiff has not offered any evidence showing that Defendants acted with actual malice. Rather, Plaintiff merely argues that Lennon should be cross-examined at trial regarding actual malice. However, Plaintiff ignores the fact that to reach that point in the litigation, she must identify specific facts in the record showing actual malice. Because she has not done so, and undisputed evidence in the record supports the conclusion that Defendants did

not publish statements in the Biography with actual malice,[8] summary judgment will be granted in favor of Defendants on the defamation per se claim.

### ii. False Light

Finally, Mallory alleges the state tort of false light. Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action. Graboff v. Colleran Firm, No. 10-1710, 2013 WL 1286662, at *16 (E.D. Pa. Mar. 28, 2013), aff'd, 744 F.3d 128 (3d Cir. 2014) (citing Fanelle v. LoJack Corp., 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000)).

Pennsylvania has adopted the definition of false light invasion of privacy set forth in the Restatement (Second) of Torts, which describes the cause of action as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E; see also Graboff, 744 F.3d at 136 (holding that, to state a claim for false light under Pennsylvania law, a plaintiff must allege facts showing that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.") The standard set forth in subsection (b) of the Restatement mirrors the "actual malice" standard for defamation claims established by New York Times and its progeny. Taha v. Bucks Cty., No. 12-6867, 2015 WL 9489586, at *3 (E.D. Pa. Dec. 30, 2015) (citing New York Times v. Sullivan, 376 U.S. 254 (1964)). In fact, the

---

[8] See, supra, pp. 12-17 for a discussion of the evidentiary record which shows no genuine issue of material fact regarding actual malice in connection with publication of the Biography.

Supreme Court has applied the "actual malice" standard to false light claims. Time, Inc. v. Hill, 385 U.S. 374 (1967); see also Coughlin v. Westinghouse Broad. and Cable, Inc., 603 F. Supp. 377, 389-90 (E.D. Pa. 1985) (finding that, where the plaintiffs failed to establish actual malice to sustain a defamation claim, they likewise could not survive summary judgment on the false light claim).

Mallory contends that the Defendants portrayed her in a false light and "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed." (Doc. No. 61 at ¶¶ 23-24.) Conversely, Defendants argue that, like her defamation claims, Mallory has not submitted sufficient evidence to show Defendants acted with actual malice, that is, "with knowledge or reckless disregard of its falsity," in publishing the Biography. (Doc. No. 94 at 21-22.)

Although Mallory's allegations of actual malice were sufficient to support a claim of false light at the early stages of litigation and overcome a motion to dismiss, Mallory must identify facts in the record showing actual malice at this stage in order to survive Defendants' Motion for Summary Judgment now. Defendants have pointed to evidence demonstrating that no issue of material fact exists regarding whether they acted with actual malice. The declarations of Lennon and Bender support the conclusion that they did not act with malice in publishing the Biography.[9] Mallory has failed to set forth specific facts showing a genuine issue of material fact on actual malice. She has merely made an allegation that Defendants acted with knowledge or reckless disregard for the truth and presented no evidence to support this claim. Because Mallory has not presented sufficient evidence to create a genuine issue of material fact on

---

[9] See, supra, pp. 12-17 for a discussion of Lennon and Benders' sworn declarations supporting the finding that no genuine issue of material fact exists regarding actual malice.

whether Defendants acted with actual malice when publishing the Biography, summary judgment will be granted on Plaintiff's false light claim.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. Nos. 93-94) will be granted.   An appropriate Order follows.